UNITED STATES DISRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.  00-3741-Civ-Huck
Magistrate Judge Brown

SUN TRUST BANK, MIAMI,
as Personal Representative of the
Estate of  CHAD HUMPHREYS,
Deceased,

        Plaintiff,

v.

SUN INTERNATIONAL HOTELS LIMITED,
a Bahamian Company; and SUN INTERNATIONAL
BAHAMAS LIMITED, a Bahamian Company

        Defendants.

_____/

## DECLARATION OF FERRON J.M. BETHELL PURSUANT TO 28 U.S.C. § 1746

### IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

I, **FERRON J.M. BETHELL, ESQ**. declare as follows:

1.     That I am a Partner in the firm of Messrs. Harry B. Sands, Lobosky & Company,

of Chambers, Shirley House, Fifty Shirley Street, in the City of Nassau on the Island of

New Providence aforesaid and since 1991 I have been responsible for its Litigation

Department.  I am over Eighteen (18) years of age and a practicing member of The

Bahamas Bar Association, having been enrolled as a Counsel and Attorney of The

Supreme Court of the Commonwealth of The Bahamas and admitted to practice on the

25th day of January, A.D. 1985.  That since being admitted to practice, I have practiced exclusively as an Advocate in the area of Civil Litigation; more particularly on the Common Law side of the Court.  That heretofore I have provided expert Opinions and/or given expert testimony in the State of Florida, the State of New York and the Province of Quebec, one of the Provinces of the Dominion of Canada, on aspects of Bahamian Law.

2.      I submit this affidavit in support of the above-named Defendants' Motion to Dismiss based on grounds of lack of personal jurisdiction, improper venue, and Forum Non Conveniens.  This affidavit is based upon my personal knowledge of the laws of the Commonwealth of The Bahamas and my knowledge through research of the applicable provisions of Bahamian law as they apply to the relevant issues.

3.      Upon information and belief, Sun Trust Bank, Miami, as personal representative of the Estate of Chad Humphreys, deceased, has filed a complaint of wrongful death arising out of the death of the Decedent at the Atlantis Resort situate on Paradise Island, an Island within the Commonwealth of The Bahamas, on the 8th day of August, 2000.

4.      That I request leave of this Honourable Court to refer to the Affidavit of Cedric L. Parker sworn on the 7th day of August, A. D. 2001 (hereinafter referred to a the "Parker Affidavit"), wherein Mr. Parker purports to opine on various aspects of Bahamian law as specifically set out at paragraphs 3 and 4 of his aforementioned Affidavit.

5.      By virtue of the Section 2 of the Declaratory Act, Chapter 4 of the Statute Laws of the Commonwealth of The Bahamas, which came into force on the 2nd December 1799, the common law of England was adopted with full force within The Bahamas. In addition, Bahamian jurisprudence also contains a substantial body of Statute law enacted by Parliament either to codify or enhance the common law. Two of these Statutes are relevant to the matter in issue; namely, the **Fatal Accidents Act**, Chapter 61 of the Statute Laws aforementioned, and the **Survival of Action Act**, 1992. Copies of the said Acts are exhibited hereto and marked "FJMB 1" and "FJMB 2", respectively.

6.      The Fatal Accidents Act – a *'wrongful death'* statute - affords certain specified categories of Dependents of the Deceased a right to bring an action for damages against a tortfeasor for recovery of the loss of the value of the dependency. Under the provisions of the Fatal Accidents Act a dependant must prove (i) a loss in the sense that he or she had a reasonable expectation of pecuniary benefit if the deceased had not been killed, and (ii) that this reasonable expectation was lost as a result of the deceased's death. In short, the measure of damage is the pecuniary loss which has been suffered and is likely to be suffered by each dependant. Albeit the Fatal Accident Act allows for the recovery of reasonable funeral expenses by a person entitled, it does not allow damages by way of *solatium* for bereavement.

7.      In addition to the Fatal Accidents Act, on the 7th day of April 1992, the Bahamian Legislature enacted the Survival of Action Act, which mirrors the United Kingdom's

Law Reform (Miscellaneous Provisions) Act 1934.  This Act is a '*survival statute*' and under its provisions, the right of action of the deceased person is deemed to survive his death and passes to his personal representatives.  The relevant section of the Survival of Action Act is Section 2(1) which provides as follows:

> **"Subject to the provisions of this section, on the death of any person after the commencement of this Act all causes of action subsisting against or vested in that person shall survive against, or, as the case may be, for the benefit of, that person's estate:**
>
> **Provided that this subsection shall not apply to causes of action for defamation, seduction or breach of promise of marriage"**

8.      Prior to the enactment of the Survival of Action Act, a deceased's estate had no cause of action at common law.  Accordingly, the Survival of Action Act lays down the general rule that on the death of any person all causes of action vested in him survive for the benefit of his estate.  Under the provisions of the Survival of Action Act, if the deceased has sustained pain and suffering as the result of his injuries in the period prior to his death, damages are recoverable.  So too are damages for loss of amenities during any such period.  Similarly, lost of earnings and other pecuniary losses in the period between injury and death are recoverable.  More importantly, the Estate in entitled to recover damage in the case of pecuniary loss during "the lost years", that is, the period after the death.  In particular, the Estate of a deceased can recover damages in respect of loss of earnings in the period after the date of death in which, had he survived, the deceased

would have made such earnings.

9.      It should also be noted that by virtue of the provisions of Section 2(5) of the Survival of Action Act, any rights conferred for the benefit of the estate of the deceased shall be in addition to and not in derogation of any rights conferred on the dependants of the deceased by the Fatal Accidents Act.  It is noteworthy that Mr. Parker in opining on Bahamian law has conspicuously failed to bring to the notice of this Honourable Court the fact that Bahamian law has both a 'wrongful death' statute and a 'survival' statute. *Neither of these Acts impose a limit on damages, which is solely a question of proof: see* **CONNOLLY v. CAMDEN AND ISLINGTON AREA HEALTH ATHORITY [1981] 3 ALL ER 250,** a copy of which is exhibited hereto and marked "FJMB 3".  If Plaintiff filed this litigation in the Bahamian courts, it would be entitled to claim damages under the Fatal Accidents Act and the Survival of Action Act, as aforementioned: see the House of Lords decision in **GAMMELL v. WILSON [1982] 1 ALL ER 578.**

10.     The judicial system in The Bahamas is entrenched in our Constitution and is comprised of the Supreme Court of the Commonwealth of The Bahamas, which is a superior court of record and has all the powers of such a court.  Appeals from final decisions of the Supreme Court lie as of right to the Court of Appeal of the Commonwealth of The Bahamas, which is also a superior court of record, having all the powers of such a court.  An appeal from a decision of the Court of Appeal lies, either as of right or with leave, to the Judicial Committee of Her Majesty's Privy Council, which

sits in the City of London in the United Kingdom.

11.     The rules of evidence used in Bahamian courts are similar to that used in other Commonwealth jurisdictions, and are in large part predicated on existing or pre-existing statute laws of the United Kingdom.  Bahamian law also provides for pre-trial document discovery in certain circumstances involving personal injury.

12.     As regards the averments contained in paragraph 6 of the Parker Affidavit, I agree that under Bahamian law if Chad's Estate "were to bring an action in the Bahamas, *the Estate and its beneficiaries* would not be able to recover any damages for emotional losses *suffered by the survivors*."  However, I should state that under Bahamian law the "survivors", i.e. in particular Chad's immediate family, would be entitled to personally claim damages for psychiatric illness (i.e. emotional distress), which was occasioned by the Defendants' negligence provided they were within sight or hearing of the event or its immediate aftermath.

13.     That as regards paragraph 7 of the Affidanvit Affidavit, to the best of my knowledge, information and belief there is no governing Rule and/or Regulation which demands or compels an Attorney to present monthly bills to his Client.  The frequency of billing is a matter of contract between Attorney and Client as is the amount requested by way of retainer.  Further, as regards the question of hourly fees it is stated in our Bar Association's "Counsel and Attorneys Remuneration" Guidelines that "charging on the

basis of time only is an attraction which must be sternly resisted...". Hence, the fact that Mr. Parker charges his Clients $450.00/hour is of no moment as there are a plethora of Attorneys, of greater seniority and experience, whose hourly rates are significantly less than $450.00/hour.

14.   The Defendants have already indicated to the Plaintiff that if the matter were litigated in The Bahamas they would not be seeking security for costs from the Plaintiff. Nonetheless, it should be appreciated that an application for security for costs is not mandatory under the Rules, but is applied for at the election of the Defendant.  Each application for security for costs involves the court in the exercise of a discretion.  Some of the factors which have been regarded as relevant in decided cases but which ought in no one case be decisive, are as follows:-

    (1)   the plaintiff's prospects of success;
    (2)   the defendant's prospects of success;
    (3)   whether the claim is bona fide;
    (4)   admissions on the pleadings and payments in;
    (5)   applications being made oppressively;
    (6)   the nexus between the plaintiffs impecuniosity and the defendant's conduct;
    (7)   whether the making of an order for security may stultify the litigation;
    (8)   public policy considerations;
    (9)   the role and resources of those who stand behind the litigants;
   (10)   whether there is any special relationship between the plaintiff and the defendant;
   (11)   whether the litigant is plaintiff or is merely defending against "self help" measures;
   (12)   whether there has been any delay in bringing the application.

15.     As regards paragraphs 10 and 11 of the Parker Affidavit, the Defendants have further undertaken to the Plaintiff that if Defendants instant Motion before this Court is successful and the Plaintiff re-institutes the matter in The Bahamas, the Defendants would concede liability and, in the premises, the question of costs would be otiose.

16.     That with respect to paragraph 12 of the Parker Affidavit wherein it is averred that it would take two to three years for Sun Trust Bank's case to get to trial, the Defendants reiterate that they will not contest proceedings in The Bahamas on liability.   In the premises, if liability is not in issue, the matter can proceed expeditiously before a Registrar of our Supreme Court on an assessment of damages.  Such an assessment can be completed within six (6) months of the institution of proceedings in The Bahamas.

17.     That as regards paragraph 14 of the Parker Affidavit I concur with the opinion expressed regarding the likelihood of obtaining a jury trial.  However, in the rare event of a jury trial of a negligence action, the respective function of the judge and jury in relation to the requirements would be as follows; the judge must (1) determine the existence of a duty of care situation; (2) explain the standard of care and scope of the duty by which to decide carelessness: (3) decide whether there is any evidence from which failure to show the requisite care may reasonably be inferred, for if he decides otherwise he does not let the case go to the jury; (4) instruct the jury as to causation and remoteness; and (5) lay down the principles for assessing damages. The jury then (1) decide on the evidence whether the defendant was careless, *i.e.* failed to show the standard of care as laid down

by the judge; (2) decide whether damage to the plaintiff was foreseeable; (3) decide causation; and (4) assess the damages.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Executed on 17th day of August, A.D. 2001.

FERRON J.M. BETHELL

"FJMB 1"



# THE STATUTE LAW

OF

# THE BAHAMAS

**1799—1987**

IN FORCE ON THE

**30th June, 1987**

As amended by the Statute Law Revision Act, 1987.

———

**REVISED EDITION.**

Prepared under the authority of The Law Reform and Revision Act, 1975

BY

SIR GORDON BRYCE, C.B.E.
of the Middle Temple, Barrister-at-Law

————

IN EIGHT VOLUMES AND A SUPPLEMENTARY VOLUME

# VOLUME II

Containing Chapters 52 to 90

———

PUBLISHED BY THE GOVERNMENT OF THE COMMONWEALTH OF THE BAHAMAS

PRINTED BY
A. Wheaton & Co Ltd, Exeter
1988

# CHAPTER 61.

## FATAL ACCIDENTS.

## ARRANGEMENT OF SECTIONS.

SECTION
1.  Short Title.
2.  Interpretation.
3.  Action Maintainable notwithstanding Death of Person Injured.
4.  Persons for whose benefit Action may be brought
5.  Damages.
6.  Assessment of Damages for Widowers, Widows and Children.
7.  Payment into Court.
8.  Limitation of Action.
9.  Plaintiff to Deliver Particulars of Person for whom Damages Claimed.
10.  Application of Act
11.  Repeal and Transitional.

## CHAPTER 61.

## FATAL ACCIDENTS.

AN ACT TO AMEND THE LAW RELATING TO THE COMPEN-
SATION OF THE FAMILIES OF PERSONS KILLED BY
ACCIDENT.

*25 of 1976.*

*[29th December, 1976.]*

1. This Act may be cited as the Fatal Accidents Act.   Short title.

2.—(1) In this Act, unless the context otherwise   Interpretation
requires —

    "adopted" means adopted in pursuance of an adop-
        tion order made under the Adoption of Chil-
        dren Act or in pursuance of an order of a court
        in any country which the Supreme Court is
        satisfied has jurisdiction to make an order
        making similar provision with similar effect to
        an order made in pursuance of that Act;   Ch. 117

    "child" includes grandchild;

    "person entitled" means a person for whose benefit
        an action may be brought under this Act;

    "parent" includes grandparent.

(2) In construing any relationship for the purposes
of this Act—

    (a) an adopted person shall be treated as a
child of the person or persons by whom he was
adopted and not as the child of any other person;
and subject thereto,

    (b) any relationship by affinity shall be treated
as a relationship by consanguinity, any relationship
of the half blood as a relationship of the whole
blood and the stepchild of any person as his child;
and

    (c) an illegitimate person shall be treated as the
legitimate child of his mother or reputed father.

3.—(1) Where the death of any person is caused by   Action maintain-
the wrongful act, neglect or default of any other person   able notwith-
and such act, neglect or default would but for his death   of person
have entitled the person injured to maintain an action for   injured

902        **CH.61.|**        FATAL ACCIDENTS.

damages in respect thereof. the person who would have been liable if death had not ensued shall be liable to an action for damages notwithstanding the death of the person injured.

(2) Notwithstanding any rule to the contrary, no action for damages under subsection (1) shall be stayed on the ground that criminal proceedings are pending or have not been taken.

<div style="margin-left:2em">Persons for whose benefit action may be brought.</div>

**4.**—(1) An action under this Act shall be brought for the benefit of any person who is the wife, husband, parent or child of the deceased or who is, or is the issue of, a brother, sister, uncle or aunt of the deceased person.

(2) An action under this Act shall be brought in the name of—

(a) the executor or administrator of the deceased on behalf of any or all persons entitled; or

(b) where there is no executor or administrator of the deceased or where the executor or administrator of the deceased fails to institute an action within six months after the date of death of the deceased, any person or persons entitled, on behalf of all persons entitled.

Damages.

**5.**—(1) In any action under this Act, the court may award such damages as it may think proportioned to the injury resulting from the death to the persons entitled respectively; and shall, after deducting costs not recovered from the defendant, divide such damages among such parties in such shares as the court may direct.

(2) Damages may be awarded in respect of the reasonable funeral expenses of the deceased person if such expenses have been incurred by a person entitled.

(3) In assessing damages in any action under this Act, there shall not be taken into account any insurance money, benefit, pension or gratuity which has been, or will or may be, paid as a result of the death.

(4) In subsection (3) of this section —

Ch. 320.

"benefit" means benefit under the National Insurance Act, and any payment by a friendly society or trade union for the relief or maintenance of a member's dependants;

"gratuity" includes a gratuity payable upon the death of a public officer or police officer under

Ch. 35

Ch. 191

the Pensions Act or the Police Act;

"insurance money" includes a return of premiums; and

"pension" includes a return of contributions and payment of a lump sum in respect of a person's employment.

6. In assessing damages payable under this Act —

(a) to a widower in respect of the death of his wife or to a widow in respect of the death of her husband, there shall not be taken into account the remarriage of the widower or widow or his or her prospects of remarriage as the case may be, or

(b) to a child in respect of the death of his father, there shall not be taken into account the remarriage or prospects of remarriage of the surviving mother.

*Assessment of damages for widowers widows and children.*

7. A defendant in any action under this Act may pay into court one sum in compensation of all persons entitled without specifying the shares into which it is to be divided.

*Payment into court.*

8.—(1) Not more than one action shall lie in respect of the same subject matter of complaint under this Act.

(2) Every action under this Act shall be commenced within three years of the date of the death of the deceased.

*Limitation of action*

9. In any action under this Act, the plaintiff shall deliver to the defendant together with his statement of claim full particulars of the person or persons for whom or on whose behalf the action is brought and of the nature of the claim in respect of which damages are sought to be recovered.

*Plaintiff to deliver particulars of person for whom damages claimed*

10. This Act shall apply only to actions brought in respect of deaths occurring after the commencement of this Act.

*Application of Act.*

11.—(1) The Fatal Accidents Act is repealed.

(2) Notwithstanding the repeal of the Fatal Accidents Act, any action which, if this Act had not been passed, would have been maintainable under that Act in respect of a death occuring before the commencement of this Act may be maintained, and if already commenced may be continued, and determined in accordance with the provisions of that Act and in all respects as if this Act had not been passed.

*Repeal and transitional. 1965 Ed Ch 67*

# ACTS

OF

## THE COMMONWEALTH OF

## THE BAHAMAS

FOR THE YEAR

1992



PRINTED BY BAHAMAS GOVERNMENT PRINTING DEPARTMENT

116

**(7) The Minister may by Order vary any fee prescribed in this section.".**

No. 6 of 1992

### An Act to amend The United States of America and The Bahamas Preclearance Agreement Act.

[Date of Assent: 7 April, 1992]

Enacted by the Parliament of The Bahamas.

1. This Act may be cited as the United States of America and The Bahamas Preclearance Agreement (Amendment) Act, 1992. *Short title.*

2. Section 3 of the United States of America and The Bahamas Preclearance Agreement Act is amended — *Amendment of Ch. 270.*

(a) in subsection (1), by the deletion of the words "which he has acquired outside the United States"; and

(b) by the deletion in subsection (3) of the words "and shall, on summary conviction therefor" and by the substitution therefor of the following words —

", which shall be prosecuted summarily, and if found guilty thereof, such person shall".

No. 7 of 1992

### An Act to Amend The Law as to The Effect of Death in Relation to Causes of Action.

[Date of Assent: 7 April, 1992]

Enacted by the Parliament of The Bahamas.

1. This Act may be cited as the Survival of Action Act, 1992. *Short title*

2.—(1) Subject to the provisions of this section, on the death of any person after the commencement of this Act all causes of action subsisting against or vested in that person shall survive against, or, as the case may be, for the benefit of, that person's estate: *Effect of death on certain causes of action*

Provided that this subsection shall not apply to causes of action for defamation, seduction or breach of promise of marriage.

117

(2)  Where a cause of action survives as aforesaid for the benefit of the estate of a deceased person, the damages recoverable for the benefit of the estate of that person —

    (a)  shall not include any exemplary damages;

    (b)  where the death of that person has been caused by the act or omission which gives rise to the cause of action, shall be calculated without reference to any loss or gain to the estate consequent on the death, except that a sum in respect of funeral expenses may be included.

(3)  No proceedings shall be maintainable in respect of a cause of action in tort which by virtue of this section has survived against the estate of a deceased person, unless either —

    (a)  proceedings against that person in respect of that cause of action were pending at the date of that person's death; or

    (b)  proceedings are taken in respect thereof not later than six months after the personal representative took out representation.

(4)  Where damage has been suffered by reason of any act or omission in respect of which a cause of action would have subsisted against any person if that person had not died before or at the same time as the damage was suffered, there shall be deemed, for the purposes of this Act, to have been subsisting against that person before death such cause of action in respect of that act or omission as would have subsisted if that person had died after the damage was suffered.

(5)  The rights conferred by this Act for the benefit of the estates of deceased persons shall be in addition to and not in derogation of any rights conferred on the dependants of deceased persons by the Fatal Accidents Act, and so much of this Act as Ch 61 relates to causes of action against the estates of deceased persons shall apply in relation to causes of action under the said Act as it applies in relation to other causes of action not expressly excepted from the operation of subsection (1).

(6)  In the event of the insolvency of an estate against which proceedings are maintainable by virtue of this section, any liability in respect of the cause of action in respect of which the proceedings are maintainable shall be deemed to be a debt provable in the administration of the estate, notwithstanding that it is a demand in the nature of the unliquidated damages arising otherwise than by a contract, promise or breach of trust.

*England Law Reports 1936 -*
ase 1:00-cv-03741-PCH- Document 76   Entered on FLSD Docket 08/23/2001   Page 18 of 3
All ER 1981 Volume 3 (08/17/2001 02:32pm)

*FJMB 3*

books on screen™

# Connolly v Camden and Islington Area Health Authority

QUEEN'S FAMILY: Children

QUEEN'S BENCH DIVISION
COMYN J
6, 7, 8 APRIL 1981

*Damages – Personal injury – Loss of future earnings – Shortened expectation of life – Loss of earnings in lost years – Young child – Action by child aged five in respect of injury sustained in course of operation performed shortly after birth – Child rendered mentally abnormal and unlikely to be able to earn a living – Whether a young child able to claim damages for loss of earnings in lost years – Whether claim proved.*

The plaintiff, a child aged nearly five years, was reduced to a severely mentally abnormal state as a result of an overdose of anaesthetic given to him while undergoing an operation in hospital shortly after his birth. As a result of his condition he would never be able to earn a living and his life expectancy was shortened to 27 $^1/_2$ years. The hospital authority admitted liability. The question arose whether the plaintiff was entitled to damages for loss of earnings in the lost years during which he would have lived but for his injury.

**Held** – A young child could claim damages under the head of damages for loss of earnings in the lost years, subject to proof of loss, and such a claim was not limited to exceptional cases, eg where the child was already earning as a television star. Accordingly, the plaintiff qualified to claim under that head of damage but on the material before the court the claim would be assessed at nil (see p 254 *c*, p 255 *g h* and p 256 *d* to *h*, post).

*Pickett v British Rail Engineering Ltd* [1979] 1 All ER 774 and dictum of Lord Scarman in *Gammell v Wilson* [1981] 1 All ER at 593 considered.

**Notes**
For damages for lost years, see 12 *Halsbury's Laws* (4th Edn) para 1154.

**Cases referred to in judgment**
*Benham v Gambling* [1941] 1 All ER 7,[1941] AC 157, 110 LJKB 49, 164 LT 290, HL, 36(1) *Digest* (Reissue) 383, *1544*.
*Gammell v Wilson, Furness v B & S Massey Ltd* [1981] 1 All ER 578,[1981] 2 WLR 248, HL.
*Pickett v British Rail Engineering Ltd, British Rail Engineering Ltd v Pickett* [1979] 1 All ER 774,[1980] AC 136,[1978] 3 WLR 955,[1979] 1 Lloyd's Rep 519, HL, *Digest* (Cont Vol E) 459, *1314b*.

**Action**
By a writ issued on 23 April 1979 the plaintiff, Liam Connolly, a minor suing by his father and next friend, Frank Brendan Connolly, brought an action against the defendants, Camden and Islington Area Health Authority and a surgeon at one of the ℅ **250** health authority's hospitals, claiming damages for personal injury sustained by him during the course of an operation. By notice dated 5 September 1980 the action against the second defendant was wholly discontinued. The facts are set out in the judgment.

*G H Rooke QC* and *W G B Hungerford* for the plaintiff.
*J R S Adams* for the health authority.

8 April 1981. The following judgment was delivered.

**COMYN J.** I am not going to keep any of the parties, particularly the parents of this little boy, in suspense, and I will announce straightaway the total sum of damages which I have arrived at, to which there will have to be added interest, on which I will hear counsel at the end. The total sum, to which interest will have to be added, is an award of £220,007.

Little Liam Connolly will be five years old in three months' time, on 24 July 1981. I have seen him and met him and he is a delightful little boy, despite the horrifying handicaps which he suffers and which I will have to deal with. He has quite exceptionally devoted and dedicated parents: a mother, who is 27 years of age, and a father, who is 37 years of age. The father is fully qualified in the plastering trade, but unhappily for some time now has been out of work.

Liam is the middle of five children, all under ten, that the parents have. No praise can be too high for them, both of them, for what they have been doing for Liam and for their determination to keep him out of an institution and in their loving care. But for them he would alas be fully qualified for institutional care for the remainder of his life. I am well satisfied, not only of their determination to bring him up themselves, but also of their ability to do so.

When Liam was born he was, as I find and is not now seriously disputed, a normal, healthy child. His two parents are of normal health and his brothers and sister are entirely normal. When he was a few days old, that is to say towards the end of July 1976, he had persistent vomiting, and he was accordingly admitted to hospital on 4 August. Six days later, when he was only 17 days old, preparations were made for an operation to cure this condition, and for the purpose of that operation he was accordingly anaesthetised. Tragically he was given a serious overdose of anaesthetic, and I need say no more about that painful fact than that liability is admitted for it on behalf of the first defendant, that is to say the Camden and Islington Area Health Authority, the authority in charge of University College Hospital where this tragedy occurred and where in fact Liam had been born.

The consequences of what happened were and are quite dreadful. I will summarise them from the medical evidence I have heard, very distinguished specialists, and from their reports and from the reports of speech therapists, and though only for a matter of about ten minutes, from my own observation. The medical evidence and reports are of the highest standard. Put shortly, Liam has been reduced to a very severely mentally abnormal child with a mental age which I put at between 15 and 18 months. He is subject to epilepsy, has had four or five attacks already and one of those lasted for an hour and a half. He will never be able to earn his living in any real sense. He will not be in a position to marry. He will need constant care and perpetual supervision. He has been walking since he was about two years of age, but he is a bit bandy legged and only walks up to about 100 yards or so at the very most. He falls over frequently, he stumbles, he hurts himself when he falls and he constantly bruises himself. He is

incontinent of urine and faeces day and night. He is only capable of speaking a very few words. He has little sustained attention. He frequently looks vacant. He cannot feed himself and he slobbers. His concentration is very poor. He can be aggressive to his brothers. He needs full assistance in washing and dressing. He has become hyperactive and also rather obstructive and destructive. For example, he will prevent other members of his family watching the television, he will break crockery or glass if any of it is to hand and he has the passion that many small children have of wanting to open doors and drawers. The ⬥ 251⬥ parents have had to fit special locks, but the danger here, which does not exist with normal children, is, for example, if he gets into the bathroom he can fill up the bath to the point of its overflowing and can damage the room and possibily himself also. He has to be watched all the time. He has a squint which is attributable to the brain damage he suffered as a result of the anaesthetic. When he goes to bed in the evening he has to have his mother to lie down with him for half an hour to three-quarters in order to get him off to sleep at all. He wakes frequently during the night and it is his habit to wake up the whole family at about 5.30 in the morning. At present he is in his parent's bedroom and they look after him, not only during the day, but during these disturbing periods at night too. It is little wonder that I find words difficult in which to express one's praise of them. He is restless, he will not settle for any period of time and the only peace which the parents have is when, during term time, he attends a special school for handicapped children. He is liable to colds and coughs and consequent respiratory trouble. He is also, unfortunately, liable to ear infections.

I make the following specific findings, which, for reasons which will appear, I regard as very important indeed. I find that he is very affectionate and very friendly, especially towards his parents and those whom he knows. I believe that his feelings run to knowledge of the affection shown towards him and also any disapproval shown to him by his parents or others. I am quite certain that now, and as time goes on, he will appreciate that other children, particularly his brothers and sister, are different to him and able to do things that he cannot do. In my judgment, he will not only know this but feel this, with a feeling of unhappiness and frustration. In my judgment also, he will feel, and feel deeply, his inability to participate with his brothers and sister and with other children. He will notice and he will feel changes around him of whatever sort they are and as his strength grows so, in my judgment, will he feel the deeper his inability to do what his strength should allow.

His mother and father have managed between themselves for much of the time since this tragic occurrence, but recently have had the benefit of help. Contrary to the submission made, if I may say so, most ably by counsel for the health authority, I consider that his brothers and sister will not be able or, if able, will not be willing to help in bringing him up. His surroundings and tradition are such that older children would help to bring up the younger children to a certain extent, but I do not regard that as at all likely here where (a) they will become increasingly conscious of, and probably impatient of, his condition; and (b) they are likely to be impatient when he acts, as act he will, provocatively.

It is very difficult to dip into the human mind even when it is a normal human mind. It is all the more difficult to dip into it when it is, alas as here, a mind retarded to the extent of the mental ability of 15 to 18 months. But, doing the best I can and weighing everything up, I consider that this little boy now appreciates and feels things; not everything but many things, and will do so increasingly. He will, in my judgment, for example, both feel and worry about his incontinence of urine and faeces. He has a degree of feeling and appreciation which I think has perhaps been rather underplayed in this case.

I have had four distinguished, careful and, may I stress this word because I mean it most sincerely, sympathetic medical witnesses called before me, two on each side, all four accompanied by their reports. When I say sympathetic I mean just that. It was a matter of great gratification for me to find that the care of their reports and evidence was also shown by their truly sympathetic attitude in regard to their little patient, Liam, plus their unbounded admiration for the parents. As an illustration of the matter, one of them said in a report that an hour or so with the little boy had exhausted him completely for some time, whereas the mother, who accompanied the little boy, appeared to take it in her stride.

I have had Professor Illingworth, an emeritus professor of child health in the University of Sheffield and also Professor Holt, a paediatrician in the University of London, for the ⬥ 252⬥ health authority. I have had Dr Hierons, a consultant neurologist at a number of hospitals, and I have had Dr Lawrence, a consultant paediatrician; Dr Hierons and Dr Lawrence being highly qualified and having long experience. The same is of course true of the two professors, but I stress it in regard to Dr Hierons and Dr Lawrence, because they do not possess professorships as such.

I have drawn on their evidence and the reports for the picture I have given of little Liam. The most important question they dealt with was the expectation of life, because of course that governs pretty well every other process in this case. Liam will be born in July. Expectation of life for the average young, middle-aged or spritely elderly person is literally in the lap of God, but in the courts we have to do our best to deal with difficult questions about expectation of life. May I say immediately that none could be more difficult than this particular case. The question of expectation of life here I approach with humility, and by that I mean with a consciousness that I may be seriously wrong one way or the other. The medical witnesses themselves appreciate that, but perhaps their appreciation cannot be quite as great as that of a judge who has to find the right number of years on which to hang everything else.

Very broadly, the medical evidence split this way: the two professors for the health authority put the expectation of life at maximum 20 years from now; the two physicians put it at 30. This is no matter where you split differences. This is a matter where one has to look with great care. There is literature on the subject which all four medical gentlemen consulted very carefully, but I think that literature is subject to one criticism which they made, and which I make, which is that it relates to statistics in respect of the whole class of mentally afflicted young people in their twenties and thirties, and the range, as we know, is depressingly and awfully wide. Reliance, for example, was put on a statistic that the figures showed an increased expectancy in recent years from mid-thirties to early forties, but that is taking, as I say, the whole broad spectrum.

I believe that in this case, although we may all be wildly wrong, I must start with the situation that this little boy almost certainly will not live beyond the age of 30. So I therefore set that at one end of my approach. I am well conscious that two very experienced professors in giving the figure of 20 are giving really what they consider to be their extremity and that they are pledging themselves to 20 in a rather stronger way than the two physicians are, or can be, to 30. Dr Hierons impressed me very much indeed on this subject. They all impressed me, but he impressed me more perhaps than the others. He, in weighing everything up and taking into account such factors as one can, hit on 27 $^1/_2$ years as being the likely lifetime of this little boy, that is to say another 22 $^3/_4$ years life.

I have thought about that a very great deal, and I have brought into play the knowledge one accumulates in these courts and in the world of handicapped children. Eighty years ago and earlier they were virtually hidden away. They were regarded all too often as being some sort of disgrace to the family. But with the years a lot of things have come about, a more tolerant attitude, a huge amount of help from the state and voluntary organisations, an immensity of goodwill from ordinary people, a willingness to help from ordinary people and also a great increase in medical knowledge and medical care.

I can well see that this little boy is exposed to infections which others would not be and that such infections with him could have more serious consequences. I also have very much in mind his epilepsy, directly caused by the anaesthetic accident, as I would call it. These and other factors go to make his risks of continued life high. There is a lot to be balanced against it. I have seen him and seen him in motion. He is a picture of perpetual motion, even more so than ordinary children aged five. Observing him and going to the reports and listening to the evidence, I think there is a lot to be put into the other side of the scale against the risks of infection and epilepsy. I think there may be sturdiness and there may well be increasing strength,

*Connolly v Camden and Islington Area Health Authority*

especially with loving care from his parents, and one knows of course all too well in these courts and elsewhere that people with handicaps very often do live on far, far beyond what is expected.

↜ 253↝

Doing the best I can in all the circumstances, I have come to the conclusion that Dr Hierons has given me the most reliable guide as to expectation of life, namely a total life of 27 $^1/_2$ years, which means a life from now of 22 $^3/_4$ years.

I want to end on this subject as I began, by saying that I approach it with humility and well conscious of the fact (a) that I may be, as medical men may be, seriously wrong one way or the other and (b) that of course financially speaking that will be of importance one way or the other. I have taken every consideration I can think of into account. I have, after reaching my provisional view, gone back over all the evidence and all the other reports. I have sought to approach the matter in many different ways, but I have come to the firm conclusion that 27 $^1/_2$ years total life, 22 $^3/_4$ years expectation of life, is the right approach here.

Turning to the question of damages, they have to be assessed under the following heads: pain, suffering and loss of amenities, future care, loss of earnings, special damage and what I would call the lost years point. To anticipate a little, I am going to find that this little boy qualifies for a lost years calculation but, pursuant to the argument of counsel for the health authority, my assessment of that is nil.

Pain, suffering and loss of amenities. I think that they amount to more than, with respect, counsel or the medical witnesses really suggested. The figures put before me for a bracket were £60,000 at the top end, well below £30,000 at the bottom end, a suggestion by counsel for the health authority that £30,000 was the right sum and a suggestion on behalf of Liam that perhaps £40,000 was the right sum. To this matter I have given the most anxious thought and have come to the conclusion that the right sum is £50,000. This is this little boy's money, peculiarly his, whilst the future care money is not. I may say that in assessing the figure of £50,000 I consider that the feeling and appreciation of this little boy and the indignities to which he will find himself subjected and the frustration which he will feel all have to go into this calculation. I feel, with respect to counsel on both sides, that it is not just in the end loss of amenities; there is quite an element of pain and suffering. I revert there simply to an awareness day and night, constantly, of incontinence of faeces. It is but one example.

In my judgment, a little boy who has suffered as this little boy has to date and who will continue to suffer for 20 years or more, as I believe, is entitled to £50,000 under this head. It is never easy to assess damages, but, in my judgment, no objective test could fault the figure of £50,000 here in the light of the evidence and the reports, not only of the doctors, but of the speech therapist too. So item 1 is £50,000 for pain, suffering and loss of amenities.

For future care I have been provided with a helpful schedule of care and attendance, which is listed under four heads: daily during school term time, daily during school holidays, a night sitter from 11 pm to 6 am and a holiday help. The term time hours are five hours a day, the school holidays time is eight hours a day, the night sitter seven hours, the holiday help a fortnight at £70 a week.

Counsel for the health authority has not quarrelled with the term time or the holidays or the holiday help. I find the hourly rate given for all of these (£2·50) as frankly modest in the extreme. Without taking any account at all of inflation, I believe that £2·50 an hour to attend to this little boy of perpetual motion by day and fairly regular intervention by night is indeed a modest sum. I find, contrary to a submission at one time by counsel for the health authority, that a night sitter can be found. There are people prepared to undertake this work. Miss Smalley of the British Nursing Association, who gave evidence before me, told me of the type of people, namely those who sought work at night but were not anxious to do light factory work or anything of that sort.

What counsel for the health authority said was, firstly, that night sitters were not necessary at all and were indeed, on the medical evidence of his medical experts, unnecessary and undesirable. He further suggested that seven hours was all right, but for seven nights a week at least two nights could be left off, and he got, by perfectly proper questioning, what might be termed an admission from Miss Smalley to that ↜ 254↝ effect. But I would not have called it an enthusiastic admission and certainly not one that I feel binds me.

Having heard this case and having outlined the facts I have, I have no doubt whatever that there should be a night sitter and that the night sitter should be for seven nights a week. I believe that in the interests of the child and in the interests of the mother to a greater extent, the father to a lesser extent, this is essential right into the future. The mother comes into the matter very acutely, because she has a family to run; she has got to be ready to look after this little boy at other times. At the present moment her sleep is subject to perpetual interruption, and the whole family are woken at about 5.30 in the morning. So I have no doubt whatever in holding that a night sitter is essential for seven nights a week. As I have said, I am also satisfied that one would be and is available.

The annual figure produced by the four items put forward on the schedule is £11,480 per year. There has been agreed as an additional annual figure to cover washing of clothes, nappies indeed, and general expenses a sum of £400, making £11,880 a year.

What is the correct multiplier here, bearing in mind that I have assessed the future loss of expectation of life occurring at 27 $^1/_2$ years of age, ie 22 $^3/_4$ years time? I have come to the conclusion that the proper multiplier is 13 years, plus one quarter, being the quarter from 24 April 1981 to 24 July and the two weeks also to be added between now and 24 April, because my calculations are all based on this child from the age of five. So that everyone can understand it, the figures as calculated by me come down to 13 years: £153,400; quarter year: £2,950; two weeks plus: £490; the total of £156,840. So that is the second item I find in relation to future care.

I now come to the question of future earnings. The only yardstick, if it can even be dignified with that word, that could be taken was in the plastering trade, following in father's footsteps. It is all very problematical, all very artificial, all very hypothetical, all very difficult. Both counsel arrived at a loss of earnings figure, based on £60 a week or thereabouts, of £15,000. They differed entirely whether that should be reduced and, if so, by how much. It was suggested to me that there ought really in the circumstances to be no deduction at all. I do not accept that view. Counsel for Liam pressed it very diligently and very charmingly, if I may say so, but on that I prefer the argument advanced by counsel for the health authority, and I prefer his figure of £7,500, being one half of the anticipated total.

To those figures has got to be added agreed special damage of £5,667. That brings the grand total, to which interest has got to be added, to £220,007, made up to £50,000,£156,840,£7,500,£5,667, total £220,007.

I will hear argument on interest in a moment, but I have got to deal, finally, and I am afraid I can deal with it rather quickly, with counsel for Liam's point about the lost years, as they were known, I think, even before *Pickett v British Rail Engineering Ltd* [1979] 1 All ER 774,[1980] AC 136 was decided in the House of Lords. There has been since in the House of Lords another case connected with *Pickett*, namely *Gammell v Wilson* [1981] 1 All ER 578,[1981] 2 WLR 248. *Pickett* established the principle that, enormously difficult though it might be, there was an element of damages to be considered and to be judged by the High Court (that case was remitted to the High Court accordingly) for the years when a man would have been working in the future, mayhap the distant future, but for the accident. It is a loss of earnings situation in a very different and long-term setting. Their Lordships in both these cases, between both these cases, applied it as being the law and applicable in regard not only to living plaintiffs but those who had died or those claiming on behalf of those who had died. I have, before this case, read and reread these two decisions. I say, with profound respect, that I do not find either of them easy for the purposes of this case. It is noticeable that it is said more than once by way of comment on *Benham v*

*Connolly v Camden and Islington Area Health Authority*

*Gambling* [1941] 1 All ER 7,[1941] AC 157 way back in 1941 that there are advantages in having more than one speech in the House of Lords. I have found the speeches in these two cases difficult so far as I am concerned in looking at the problem that I have to look at. It seems to me that what their Lordships say with clarity is that a 255 young man, or even a middle-aged man, well fixed on a professional or trade course can rightly expect for himself or his estate or dependants the financial benefit of the years that he would have worked or would have been likely to have worked but for the accident and that that calculation has to be done although it involves necessarily a great many hypothetical considerations and a good deal of guess work. But running as an undercurrent in some of the speeches in these two cases is the fact that a child is in a different position. With great respect, I agree that there are obviously differences not only in age but in the question of actual future occupation, the age at which the lost years are to begin, how many lost years are to be taken, what rate they are to be taken at and so forth.

Lord Scarman said in *Gammell v Wilson* [1981] 1 All ER 578 at 593,[1981] 2 WLR 248 at 265:

'… the court must make the best estimate it can. In civil litigation it is the balance of probabilities which matters. [Then there follow these words:] In the case of a young child, the lost years of earning capacity will ordinarily be so distant that assessment is mere speculation. No estimate being possible, no award, not even a "conventional" award, should ordinarily be made. Even so, there will be exceptions: a child television star, cut short in her prime at the age of five, might have a claim; it would depend on the evidence. A teenage boy or girl, however, as in *Gammell*'s case may well be able to show either actual employment or real prospects …'

What am I to deduce from these cases in regard to a child of, to take the present case, nearly five? Is it being said by their Lordships as a matter of law binding on me that there is no claim possible in respect of such a child except in purely exceptional circumstances, such as I would call, perhaps somewhat old-fashionedly, the Shirley Temple type of case? I do not think that can be so. Other courts in this building deal with children up to the age of 16, sometimes to 18 and exceptionally beyond. I do not think, with respect, that any hard and fast rule can be laid down, and I think a child qualifies as such under this head of damage dependent on the ability to prove. It is difficult enough in the case of a teenager or a middle-aged person to prove something for lost years. It is more difficult for a child, but I can envisage, with respect, far more examples than the Shirley Temple case or that of a television star. I can envisage the only son of a father who owns a prosperous business. I can envisage the son who is born to a farmer who is able to leave the estate to the son. I can envisage a number of situations where the court can look at something and find that there are lost years to be compensated for.

It is not my intention in this judgment to seek to contribute to the wealth of learning on this subject or to turn my judgment into a sort of Law Quarterly Review article on this subject. But what I hold, and hold clearly, is that *Pickett v British Rail Engineering Ltd* and *Gammell v Wilson* give this little boy a head of claim for lost years, but on the material before me I am going to follow precisely the way counsel for the health authority put it, which I believe expressly states the law, not that there is no claim but that there is a claim but I assess it at nil.

In those circumstances there will be judgment for £220,007.

*Judgment for the plaintiff for £220,007.*

Solicitors: *Bindman & Partners* (for the plaintiff); *Hempsons* (for the health authority).

K Mydeen Esq  Barrister.

"FJ17B 4"

# Gammell v Wilson and others
# Furness and another v B & S Massey Ltd

CIVIL PROCEDURE: QUANTUM

HOUSE OF LORDS
LORD DIPLOCK, LORD EDMUND-DAVIES, LORD FRASER OF TULLYBELTON, LORD RUSSELL OF KILLOWEN AND LORD SCARMAN
18, 19, 24 NOVEMBER 1980, 5 FEBRUARY 1981

*Damages – Personal injuries – Action for benefit of deceased's estate – Whether damages recoverable in respect of loss of earnings in lost years – Basis on which damages if recoverable to be assessed – Law Reform (Miscellaneous Provisions) Act 1934, s 1(2).*

The plaintiffs in two separate actions were the parents of two young men who had been killed in accidents as the result of the negligence of the respective defendants. Both deceased died intestate and the plaintiffs were therefore the administrators of their estates. In both actions the plaintiffs claimed damages against the defendants under (i) the Fatal Accidents Act 1976 (or in the second action, the Fatal Accidents Acts 1846 to 1959) on behalf of themselves as dependants and (ii) the Law Reform (Miscellaneous Provisions) Act 1934 on behalf of the deceased's estate.

In the first case, the plaintiff's 1 year old son was killed in a road accident. He had started working and had a career planned. The defendants admitted liability and the only issue was the quantum of damages. For the purpose of the 1976 Act, the trial judge assessed the dependencies of the plaintiff and his wife at £250 and £1,750 respectively and, on the claim under the 1934 Act, awarded the plaintiff damages totalling £9,335, which included £1,750 for loss of expectation of life, and £6,656 for the son's loss of future earnings during the years of life lost to him because of the defendants' negligence ('the lost years'), on the basis that the son would have earned £416 a year net after deduction of living expenses to which the judge applied a multiplier of 16 years. An appeal by the defendants against the award under the 1934 Act was dismissed by the Court of Appeal ([1980] 2 All ER 557). The defendants appealed to the House of Lords.

In the second case, the plaintiffs' 2 year old son was killed in the course of his employment. The defendants, his employers, admitted liability subject to contributory negligence of 10%. For the purposes of the fatal accident claim the trial judge assessed the dependencies of the plaintiffs at £2,028 and, on the claim under the 1934 Act, awarded damages which included £17,275 (less 10%) for loss of earnings during the lost years. The defendants appealed to the House of Lords.

In each case, because the award to the estate under the 1934 Act exceeded that under the Fatal Accidents Acts, no award was made in respect of the fatal accident claim, in accordance with the rule that in assessing loss of dependency under the Fatal Accidents Acts the court was required to take into account any benefit accruing to a dependant from the deceased's estate. At the hearing of the appeals the respective defendants contended that in a claim under the 1934 Act a deceased's estate was not entitled to recover damages for the deceased's loss of earnings during the lost years because the cause ⸎ 578⸎ of action for such earnings was a 'gain to the estate' while the loss of the earnings was a 'loss to the estate' and that therefore, in accordance with the requirement of s 1(2)(c)ᵃ of the 1934 Act that damages under the Act were to be 'calculated without reference to any loss or gain to [the] estate consequent on [the deceased's] death', such damages were to be ignored in the assessment of damages awarded to the estate. The defendants further contended that in any event, even if such damages could be awarded under the 1934 Act, the amounts awarded were excessive.

─────────

a   Section 1(2), so far as material, is set out at p 585 a, post

─────────

**Held** – The appeals would be dismissed for the following reasons—

(1) On the true construction of s 1(2)(c) of the 1934 Act the restriction on an estate recovering or being deprived of a 'loss or gain to [the] estate' consequent on a person's death applied only to a loss or gain directly consequent on the death and not to a loss or gain resulting from a right to recover damages which vested in the deceased immediately before his death and which then passed to the beneficiaries of his estate, whether they were his dependants or not. That construction, coupled with the principle that a cause of action for loss of earnings in the lost years vested in the deceased before he died (and in the case of instantaneous death vested in him immediately before he died) meant that the estate was not precluded by s 1(2)(c) from recovering damages for the deceased's loss of earnings during the lost years in a claim under the 1934 Act. Accordingly, even though it produced a result which was neither sensible nor just, the House was constrained to hold that the plaintiffs were entitled to the damages awarded for the lost years despite the fact that these damages far exceeded the amount to which they were entitled under the 1976 Act as dependants (see p 581 c, p 584 d f g i, p 586 g h, p 588 c to j, p 590 f to j, p 592 c d f g and p 593 b c, post); *Rose v Ford* [1937] 3 All ER 359 and *Pickett v British Rail Engineering Ltd* [1979] 1 All ER 774 applied.

(2) On the principle that damages for loss of earnings in the lost years should be fair compensation for the loss suffered by the deceased in his lifetime, there was no room for conventional award. Accordingly, the court was required to make the best estimate it could on the evidence available, which was what the trial judge in each case had done. The awards would therefore not be disturbed (see p 581 c to f, p 587 j, p 588 b to e h j, p 590 h j, p 593 d to g and p 594 f h, post).

Per Curiam. The law in England and Wales relating to damages for death recoverable by the estate of a deceased is neither sensible nor just, but it is so well established that change can only be brought about by legislation, a good model for which would be the Damages (Scotland) Act 1976 (see p 583 h, p 587 d to f, p 588 d h, p 590 g, p 592 b c and p 595 d e, post).

Decision of the Court of Appeal in *Gammell v Wilson* [1980] 2 All ER 557 affirmed.

## Notes

For damages for loss of future earnings under the Law Reform (Miscellaneous Provisions) Act 1934, s 1, see 12 *Halsbury's Laws* (4th Edn) para 1154.

For the Law Reform (Miscellaneous Provisions) Act 1934, s 1, see 13 *Halsbury's Statutes* (3rd Edn) 115.

## Cases referred to in opinions

*Benham v Gambling* [1941] 1 All ER 7,[1941] AC 157, 110 LJKB 49, 164 LT 290, HL, 36(1) *Digest* (Reissue) 383, *1544*.

*Flint v Lovell* [1935] 1 KB 354,[1934] All ER Rep 200, 104 LJKB 199, 152 LT 231, CA, 36(1) *Digest* (Reissue) 317, *1276*.

ase 1:03-cv-08034-JSR  Document 76   Entered on FLSD Docket 08/23/2001  Page 23 of 3

*All England Law Reports 1936-*
*All ER 1981 Volume 1 (08/17/2001 02:34pm)*
*Gammell v Wilson and others Furness and another v B & S Massey Ltd*

*Kandalla v British Airways Board (formerly British European Airways Corpn)* [1980] 1 All ER 341,[1980] 2 WLR 730.
*Oliver v Ashman* [1961] 3 All ER 323,[1962] 2 QB 210,[1961] 3 WLR 669, CA, 36(1) *Digest* (Reissue) 313, *1267.*
*Pickett v British Rail Engineering Ltd* [1979] 1 All ER 774,[1980] AC 136,[1978] 3 WLR 955,[1979] 1 Lloyd's Rep 519, HL, *Digest* (Cont Vol E) 459, *1314b.*

**579**

*Quirk v Thomas* [1916] 1 KB 516, 85 LJKB 519, 114 LT 308, CA, 17 *Digest* (Reissue) 122, *220.*
*Rose v Ford* [1937] 3 All ER 359,[1937] AC 826, 106 LJKB 576, 157 LT 174, HL, 36(1) *Digest* (Reissue) 382, *1530.*

**Appeals**

*Gammell v Wilson and another*

By a writ issued on 18 October 1977 the plaintiff, James Gammell, brought an action against the defendants, Reginald Wilson and Swift & Co Ltd, claiming damages under the Fatal Accidents Act 1976 and the Law Reform (Miscellaneous Provisions) Act 1934, in respect of the death of his son, Edward James Gammell, on 3 September 1976 in a road accident caused by the first defendant's negligence for which the second defendants were vicariously liable. The defendants admitted liability but disputed the quantum of damages. On 27 July 1979 Mr B A Hytner QC, sitting as a deputy judge of the High Court, gave judgment for the plaintiff under the 1934 Act for damages in the sum of £9,335·04 on the basis of £6,656 damages for loss of future earnings,£584·04 special damages plus £40 interest thereon, and £1,750 damages for loss of expectation of life plus £305 interest thereon. The judge made no award under the 1976 Act on the basis that the claim under that Act was eliminated by the amount of the award under the 1934 Act. The defendants appealed against the amount awarded under the 1934 Act, on the grounds (1) that the judge was wrong in law and misdirected himself in awarding any sum by way of damages under the Act in respect of lost earnings during the years of life lost to the son because of the defendants' negligence ('the lost years'),(2) alternatively, that the sum awarded for the lost years by the judge was excessive,(3) that the sum awarded in respect of a memorial or gravestone for the son was excessive, and (4) that the sum awarded in respect of loss of expectation of life was excessive. On 1 April 1980 the Court of Appeal (Brandon LJ and Sir David Cairns, Megaw LJ dissenting)([1980] 2 All ER 557,[1980] 3 WLR 591) allowed the appeal in respect of damages for loss of expectation of life and reduced the element of damages to £1,235, but (Megaw LJ concurring) dismissed the appeal in respect of the other two elements of the award. As the total award under the 1934 Act was in excess of the sums recoverable under the 1976 Act no award was made under that Act, and accordingly the plaintiff was awarded a sum of £8,745 damages (the interest payable on the general damages being reduced to £215). The defendants appealed to the House of Lords with the leave of the Court of Appeal. The appeal was confined to the award of £6,656 in respect of the loss of earnings during the lost years. The facts are set out in the opinion of Lord Scarman.

*Furness and another v B & S Massey Ltd*

By a writ issued on 15 April 1977 and statement of claim amended pursuant to an order of Tudor Evans J on 14 November 1979 the plaintiffs, Marian Furness and Edward Furness, as administrators of the estate of their son, Kevin Furness deceased, brought an action against the defendants, B & S Massey Ltd, claiming damages under the Fatal Accidents Acts 1846 to 1959 and the Law Reform (Miscellaneous Provisions) Act 1934 in respect of their son's death on 31 August 1976 in an accident at the premises of the defendants during the course of his employment with them caused by the defendants' negligence and breach of statutory duty. Liability was not in issue. The parties agreed that the deceased was 10% to blame for the accident. On 20 December 1979 Tudor Evans J gave judgment for the plaintiffs for damages under the 1934 Act in the sum of £1,350 for loss of expectation of life,£273 agreed funeral expenses, and £15,547 for loss of earnings which the deceased would have earned during the years lost to him by his premature death ('the lost years'), those sums being 90% of the value of their claims. As the total award under the 1934 Act was far in excess of the sum recoverable under the Fatal Accidents Acts, ie £1,825, no award was made under those Acts, the damages thereunder being absorbed by the award of damages under the 1934 Act. The judge therefore awarded the plaintiffs a total sum of £17,170 plus £924 interest. The plaintiffs were awarded damages in respect of the lost years because the judge considered that he **580** was required to do so by virtue of the decision of the House of Lords in *Pickett v British Rail Engineering Ltd* [1979] 1 All ER 774,[1980] AC 136. Pursuant to a certificate granted by the judge under s 12 of the Administration of Justice Act 1969 and with the leave of the House granted on 5 March 1980 the defendants appealed directly to the House of Lords against the award of damages in respect of the lost years. Since the appeal raised the same point as the considered in *Gammell v Wilson* the appeals were heard together. The facts are set out in the opinion of Lord Scarman.

*Piers Ashworth QC* and *William Gage* for Mr Wilson and Swift & Co Ltd.
*Lionel Swift QC* and *Christopher Summer* for Mr Gammell.
*Piers Ashworth QC* and *J Rowe* for B & S Massey Ltd.
*Richard Clegg QC* and *Janet Smith* for Mr and Mrs Furness.

*Their Lordships took time for consideration*

5 February 1981. The following opinions were delivered.

**LORD DIPLOCK.** My Lords, I understand your Lordships to be at one in holding that both of these appeals must be dismissed. I am of the same opinion, reluctantly, because I do not think that this outcome is either sensible or just.
On the answer to the question of construction of s 1(2)(c) of the Law Reform (Miscellaneous Provisions) Act 1934, I find myself in agreement with your Lordships' acceptance of the interpretation placed on it by the majority of the Court of Appeal in *Gammell v Wilson* [1980] 2 All ER 557,[1980] 3 WLR 591. On the question whether this House would be justified in interfering with the damages awarded by the trial judge in either of the cases I agree with your Lordships that we should not. Where the deceased is as young as in these two cases (15 and 22 years respectively) the law requires the judge to indulge in what can be no better than the merest speculation about what might have happened to the deceased during a normal working lifespan if he had not been prematurely killed. Although I think that the award in *Furness v B & S Massey Ltd* was so high as to approach the borderline at which an appellate court would be justified in interfering even in so speculative an assessment, I nevertheless consider that it falls short of crossing it.
In England today the law about damages for death has been developed partly by Parliament through legislation now consolidated in the Fatal Accidents Act 1976, and partly by judicial decisions arrived at on a case to case basis. This has its dangers, for the facts presented by what turns out to

All England Law Reports 1936
ase 1:00-cv-03741-PCH Document 76   Entered on FLSD Docket 08/23/2001   Page 24 of 3
All ER 1981 Volume 1 (08/17/2001 02:34pm)

books on screen™

*Gammell v Wilson and others Furness and another v B & S Massey Ltd*

be a landmark case may make the legal principle therein stated appear beguilingly simple of application. But this may be falsified by subsequent experience. In the result the law of damages for death has, in my view, reached a state for which I can see no social, moral or logical justification. The first judicial step down the slippery slope that led into a morass from which I think that only Parliament can now extricate us was taken by the Court of Appeal in *Flint v Lovell* [1935] 1 KB 354,[1934] All ER Rep 200, where it was held that a wealthy and previously healthy living plaintiff aged 69 years whose lifespan was likely to be shortened by some five or six years by the injury he had sustained could recover under the head of 'loss of expectation of life' an unidentifiable part of a total sum of £4,000 awarded as general damages. To draw up in hard cash a balance sheet in which the joys and pleasures of life which the victim would have experienced during 'the lost years' are weighed against his suffering and sorrows led to such divergences in assessment as between one case and another that ultimately this House in *Benham v Gambling* [1941] 1 All ER 7,[1941] AC 157 felt constrained to hold that this element in damages for personal injuries in all but the most exceptional cases should be limited to a moderate arbitrary sum to be awarded regardless of the particular circumstances of the plaintiff or the number of years that it was estimated he had lost. Whatever logic might have justified awarding damages on a compensatory basis for loss of expectation of life, it vanished with the decision in *Benham v Gambling*.

⊛ 581⊛

It might have been supposed that an award of damages for loss of expectation of life took into account on the credit side the satisfaction of earning money by one's work. In *Oliver v Ashman* [1961] 3 All ER 323,[1962] 2 QB 210 the Court of Appeal drew this conclusion and held that earnings lost during the lost years were not recoverable as an additional item of damages. So far as living plaintiffs were concerned, it looked by 1968 as if the law as to the assessment of damages to be awarded for 'the lost years', after a temporary aberration between *Flint v Lovell* and *Benham v Gambling*, presented no insuperable difficulties, however lacking in strict logical justification it might be.

And so the law for living plaintiffs as to the recovery of damages for the lost years remained until the decision of this House in *Pickett v British Rail Engineering Ltd* [1979] 1 All ER 774,[1980] AC 136. If the plaintiff died after he had recovered judgment his cause of action merged in the judgment and the judgment debt became an asset which formed part of his estate; but, so long as the old rule actio personalis moritur cum persona applied, if he died from his injuries before he had brought his action and recovered judgment, his own cause of action lapsed and where he left a widow or dependent relatives who had looked to him for their support it was replaced by a statutory cause of action for their benefit under the Fatal Accidents Acts 1846 to 1908. The damages recoverable under these Acts were purely compensatory and were assessed according to the jury's estimate of the economic loss which the dependants had suffered and would continue to suffer in consequence of the withdrawal of the deceased's support. It was not until the passing of the Law Reform (Miscellaneous Provisions) Act 1934 that the personal representative of the deceased had a cause of action for loss to the deceased's estate resulting from his premature death.

Section 1 of the 1934 Act by abolishing the maxim actio personalis moritur cum persona enabled damages suffered by the deceased before his death under the three heads, loss of earnings, pain and suffering and loss of expectation of life, to be recovered for the benefit of his estate in an action brought after his death. The Act did not deprive the deceased's dependants of their statutory cause of action under the Fatal Accidents Acts, but in the usual case, in which it was the deceased's dependants who succeeded beneficially to his estate, this seldom involved any duplication of the damages recoverable, since the financial benefit accruing to the dependants from the estate fell to be deducted from the compensation for loss of dependency awarded to them under the Fatal Accidents Acts. Since damages for loss of expectation of life had become a conventional sum and pain and suffering and loss of earnings were suffered only up to the time of death, it was not often that, in cases of fatal injuries, the damages under the 1934 Act exceeded the amount of the dependency.

The amount by which the estate of the deceased was increased by damages awarded under the 1934 Act would not, however, be deductible from the damages awarded under the Fatal Accidents Acts, except in the case of beneficiaries under the deceased's estate who were dependent relatives. This seems to have occurred very seldom, and where it did the sums involved in bequests to non-dependent beneficiaries were relatively small. There would, however, be an anomaly that would offend one's sense of justice, if a living plaintiff, after having obtained a judgment in his favour which took no account of what he would have earned in the lost years, died shortly after from the injuries which he had sustained. His cause of action would have merged in the judgment and, although I know of no direct authority on the point, it has always been regarded as too clear to brook of argument that the merger of this cause of action carries with it the merger of any cause of action by his dependants under the Fatal Accidents Acts, however great and prolonged their dependency might have been expected to be. At best his dependants could be compensated for their loss of his future support to the extent to which his estate had been augmented by the damages awarded to him; and they would be deprived even of this compensation unless they were the beneficial successors to his estate. The anomaly is not one that was likely to be brought to the attention of the court directly as a matter of decision; but it did arise in *Pickett v British Rail Engineering Ltd*, because the deceased before his death had obtained a judgment in his lifetime for damages for personal injuries which, in accordance with the rule in *Oliver v Ashman*, did not include any ⊛ 582⊛ compensation for his potential earnings during the lost years. An appeal launched in his lifetime against this judgment was carried on after his death by his dependent widow as administratrix of his estate. The deceased in that case was aged 53 at the date of the trial. But for the injury (an industrial disease) in respect of which he sued he could have expected to continue working for another 12 years until the normal retirement age of 65. As a result of the injury his expectation of life was estimated to be reduced to one year, an estimate which events proved to have been accurate. So he lost 11 years during when he would have been earning good wages out of which he would have maintained his wife.

If the deceased had died before judgment in his action had been entered his widow would have had her cause of action under the Fatal Accidents Acts. This would have enabled her to recover the value of the provision that he would have made for her needs out of his earnings during those 11 'lost years'. But because he died after the judgment his dependent widow was deprived of that cause of action, and the general damages for pain and suffering recoverable on behalf of his estate, of which she was the sole beneficiary, fell considerably short of the sum that she would have been likely to recover under the Fatal Accidents Acts as the amount of the dependency if that cause of action had remained open to her.

Here was an obvious injustice that this House remedied by overruling *Oliver v Ashman* and holding that a living plaintiff could recover damages for loss of earnings during the lost years, but that in assessing the measure of such damages there should be deducted from the total earnings the amount that he would have spent out of those earnings on his own living expenses and pleasures since these would represent an expense that would be saved in consequence of his death. In the case of a married man of middle age and of a settled pattern of life, which was the case of Mr Pickett, the effect of this deduction is to leave a net figure which represents the amount which he would have spent on providing for his wife and any other dependants, together with any savings that he might have set aside out of his income. If one ignores the savings element, which in most cases would be likely to be small, this net figure is substantially the same as the damages that would have been recoverable by the widow under the Fatal Accidents Acts: it represents the dependency. So, in the particular case of Mr Pickett's widow the result was to do substantial justice.

My Lords, if the only victims of fatal accidents were middle-aged married men in steady employment living their lives according to a well-settled pattern that would have been unlikely to change if they had lived on uninjured, the assessment of damages for loss of earnings during the lost years may not involve what can only be matters of purest speculation. But, as the instant appeals demonstrate and so do other unreported cases which have been drawn to the attention of this House, in cases where there is no such settled pattern (and this must be so in a high proportion of cases of fatal injuries) the

*Gammell v Wilson and others Furness and another v B & S Massey Ltd*

judge is faced with a task that is so purely one of guesswork that it is not susceptible of solution by the judicial process. Guesses by different judges are likely to differ widely, yet no one can say that one is right and another wrong.

Where Parliament has intervened by passing the Fatal Accidents Acts, the law relating to damages for death recoverable by dependants is sensible and just with the possible exception of the case of widows who have remarried or become engaged to do so by the time the action is heard. I join with your Lordships in thinking that it is too late for anything short of legislation to bring the like sense and justice to the law relating to damages for death recoverable by the estate of the deceased.

**LORD EDMUND-DAVIES.** My Lords, in *Pickett v British Rail Engineering Ltd* [1979] 1 All ER 774,[1980] AC 136 this House found itself ineluctably driven to hold that an injured plaintiff whose working life had been shortened as a result of the defendant's negligence was entitled to be compensated for any loss of earnings during the period ('the lost years') when, but for his injuries, he would have been likely to continue at work. In these two appeals we are confronted by a situation different in an important respect from that in *Pickett*. For, whereas there the plaintiff had instituted proceedings and actually ᴄ **583ɪ** recovered judgment during his lifetime, in the present appeals the respective plaintiffs are administrators of the estates of deceased persons who were killed either instantaneously or very shortly after being involved in accidents attributable to the defendants' negligence.

The facts are summarised in the speech of my noble and learned friend Lord Scarman and I need not add to his narrative. In each case the plaintiffs are also the parents of the deceased (each of whom died intestate) and they sue (1) under the Fatal Accidents Act 1976 on behalf of themselves as dependants and (2) under the Law Reform (Miscellaneous Provisions) Act 1934 on behalf of the deceased's estate. No question arises as to the awards under the former, but, in relation to the 1934 Act awards for the 'lost years' of £6,656 in the *Gammell* case and £15,547 in the *Furness* case, two questions are raised by these appeals. (A) Does an action lie to recover such damages, seeing that the injured party died without having instituted legal proceedings? (B) If an action does lie, on what basis should damages for the 'lost years' be assessed? The submission in each of the two cases is that both points were incorrectly disposed of by the respective trial judges and by the majority of the Court of Appeal in *Gammell*. I turn to consider these questions.

*(A) Does the action lie?*

My Lords, subject to what must later be said about sub-s(2)(*c*) of s 1 of the Law Reform (Miscellaneous Provisions) Act 1934, in my judgment an affirmative answer to that question is obligatory in the light of the decisions of this House in *Rose v Ford* [1937] 3 All ER 359,[1937] AC 826 and *Pickett*. For it is impossible to distinguish in legal principle between a claim in respect of shortened expectation of life on the one hand and in respect of shortened expectation of *working* life on the other. And in *Rose v Ford* [1937] 3 All ER 359 at 365–366,[1937] AC 826 at 839 Lord Russell said:

> 'I am of the opinion that, if a person's expectation of life is curtailed, he is necessarily deprived of something of value, and that, if that loss to him is occasioned by the negligence of another, that other is liable to him in damages for the loss. That cause of action was vested in the deceased before and when she died, and, by virtue of the Act of 1934, it survives for the benefit of her estate. It is no new cause of action created by that Act; it is a cause of action existing independently of the Act, which by the Act is preserved from the extinction which the death of the deceased would otherwise have brought about.'

That passage must equally be applicable in its entirety to a claim in respect of the 'lost years' resulting from cutting short a person's *working* life, and, as Holroyd Pearce LJ said in *Oliver v Ashman* [1961] 3 All ER 323 at 330,[1962] 2 QB 210 at 227–228, it leaves 'no room for distinguishing between a claim brought by a living plaintiff and a claim brought on behalf of a dead plaintiff in respect of the loss of earnings during the years of which he has been deprived'. In an earlier passage ([1961] 3 All ER 323 at 329–330,[1962] 2 QB 210 at 227) Holroyd Pearce LJ recalled that in *Rose v Ford* [1937] 3 All ER 359 at 363,[1937] AC 826 at 835 Lord Atkin had rhetorically asked,'Can the damages include a calculation of loss of income which the deceased would have received during normal expectation of life but would not have saved so as to increase his estate?', and commented: 'Those words seem by implication to suggest that he could at least claim such sums as he would have saved during the lost years.' This is in line with the view expressed by Lord Scarman in *Pickett* [1979] 1 All ER 774 at 798,[1980] AC 136 at 171 that, as to the lost years,... a plaintiff (or his estate) should not recover more than that which would have remained at his disposal after meeting his living expenses'.

The decision in *Pickett* was carefully analysed by Megaw LJ in the course of his dissenting judgment in *Gammell*. I respectfully agree with him that there did not emerge therefrom 'in obiter dicta a clear consensus that the earnings of the lost years should equally be recoverable in a Law Reform Act claim as in a claim brought by the victim himself'. But the search for obiter dicta is in my judgment unnecessary, for the interaction of *Pickett* itself and s 1(1) of the 1934 Act surely leads to the inevitable conclusion that a claim for the lost years does lie in each of these two cases.

ᴄ **584ɪ**

Indeed the appellants in both cases accept that this would be so were it not for the provision in s 1(2)(*c*) of the 1934 Act that—

> 'where the death … has been caused by the act or omission which gives rise to the cause of action,[the damages recoverable for the benefit of the estate of the victim] shall be calculated without reference to any loss or gain to his estate consequent on his death, except that a sum in respect of funeral expenses may be included.'

The appellants submit that this provision is fatal to the claim made in relation to the 'lost years' in each case. The contrary view was expressed in the *Furness* case by Tudor Evans J, who held that such cause of action was vested in the deceased the instant before he died and that the loss was accordingly consequent not on the death but on the tortious act of the wrongdoer. And the majority of the Court of Appeal reached a similar conclusion in *Gammell*.

My Lords, the general nature of the wording of s 1 of the 1934 Act is important, providing as it does ('subject to the provisions of this section') for the survival of *all* causes of action vested in the deceased. What follows by way of exception to the general rule should be restrictively interpreted, lest that generality be largely or completely nullified. It deals simply with the calculation of the damages exigible in relation to an established cause of action, and in *Rose v Ford* [1937] 3 All ER 359 at 363,[1937] AC 826 at 835 Lord Atkin said:

> 'I can see the possibility of discussion in the provision of sect.(2)(*c*) that the damages "shall be calculated without reference to any loss or gain to his estate consequent on his death". Plainly this does not mean that his estate is not to gain by the award of any damages at all, for this would be absurd.'

Lord Wright, referring specifically to s 1(2)(*c*), described it as 'especially significant because it particulars certain classes of losses and gains', and added ([1937] 3 All ER 359 at 368,[1937] AC 826 at 842):

*Gammell v Wilson and others Furness and another v B & S Massey Ltd*

'It presupposes that damages may, in general, be calculated where death has been caused by the wrong, but excludes from the calculation losses or gains to the estate consequent on the death. I need not examine the full scope of this proviso, which is not directly material in this appeal. Obvious instances of what are referred to are such items as, on the one side, insurance moneys falling due on death, and, on the other, annuities ceasing on death. These are irrelevant to the question of what damages can survive, because the dead man could neither have collected such gains nor experienced such losses. They are subsequent to, and only remotely, connected with, his death … The claim now in question is, by contrast, one for personal injuries suffered by the deceased girl while alive.'

And so, too, are the claims made under the 1934 Act in each of the two cases now being considered. Fully cognisant of s 1(2)(c), Lord Wright regarded it as having no impingement on the claim there being advanced.

But there has been some discussion over the years whether Lord Wright was correct in citing annuities ceasing on death as falling within s 1(2)(c), Megaw LJ, for example, commenting that such a loss '*would* have been an element in the damages recoverable by a plaintiff bringing an action on his own account, who was able to show a shortened expectation of life', and concluding that if Lord Wright's example was correctly chosen,'… it must, as I see it, follow that the loss of income in the lost years must also not be taken into account'(see [1980] 2 All ER 557 at 565,[1980] 3 WLR 591 at 600).

If this indeed be the logical conclusion, it must, in my judgment, be held that Lord Wright was erroneous in citing annuities ceasing on death as illustrating a 'loss' within s 1(2)(c). For, with the solitary exception of funeral expenses, the section creates *no* new cause of action and deals only with those vested in the deceased at the time of his death, and sub-s (2) provides that, even though such causes of action survive by virtue of sub-s (1), the quantum of damages otherwise recoverable thereunder are in certain instances to be reduced from those recoverable by a living plaintiff. It is an awkwardly framed ⊄ 58⁄ subsection, and para (c) in particular could have been more clearly expressed; it may have been drafted in a hurry, Acton J having given judgment in *Flint v Lovell* [1935] 1 KB 354,[1934] All ER Rep 200 on 13 May 1934, and the Act receiving the royal assent on 25 July. Paragraph (a) deals with exemplary damages, such as may be recovered by a living plaintiff to penalise outrageous conduct by a defendant and so rehabilitate the plaintiff's good name; but if the injured party has died there is no merit in penalising the defendant merely to increase the estate of the deceased. Paragraph (b) deals with breach of promise of marriage, which could well result in loss of money spent in preparation for the marriage; and under s 1(1) this could have been recovered even though the death of the injured party had supervened. But, although, until the Law Reform (Miscellaneous Provisions) Act 1970, s 1 abolished the cause of action, exemplary damages could be recovered 'in respect of the personal injury to the plaintiff occasioned by the personal conduct of the defendant'(see *Quirk v Thomas* [1916] 1 KB 516 at 527 per Swinfen Eady LJ), the 1934 Act by sub-s (2)(b) in effect rendered such damages irrecoverable after the death of the injured party. Subsection (2)(c) is more complicated. But its effect, in my judgment, is that the fact that death has occurred as a result of the defendant's wrongful act is *not* to increase or reduce such damages as would have been recoverable by the plaintiff when alive. As Chapman helpfully commented (Statutes on the Law of Tort (1962, p 6)):

'(i) If a person is killed as a result of negligent driving of a motor-car, it may happen that enormous damage is caused to his estate by reason of the fact that death duties become payable which would have been avoided had he survived for another month, a week, or day. The *loss* to the estate on that account is to be ignored.(ii) By reason of a person's death on a particular day there may be enormous benefit to his estate as a result of the operation of family settlements. The benefit to the estate on that account is to be ignored.'

But Megaw LJ, drawing what he regarded as an essential distinction between loss of earnings before death and after death, said ([1980] 2 All ER 557 at 566,[1980] 3 WLR 591 at 601):

'If the victim has survived for, say, six months or a year, but has died before action brought or before judgment in an action brought by him, any loss of earnings caused by his injuries up to the date of death is recoverable as a part of the damages in the Law Reform Act action. For they are a loss antecedent to, but in no way caused by, or "consequent on" his death. But the loss of earnings thereafter is consequent on his death. Hence it is excluded by s 1(2)(c).'

I respectfully disagree. Just as Lord Russell observed in *Rose v Ford* [1937] 3 All ER 359 at 365,[1937] AC 826 at 838 that damages for shortened expectation of life '… are not for loss to the estate consequent on the death, but for loss to a living person consequent on the wrongful act of the defendant', so also damages for cutting short a man's working life (the 'lost years') are in no sense 'consequent on the death'. Sir Noel Hutton QC has rightly observed that 'The relevance of the death is purely evidentiary as providing conclusive proof that the deceased's expectation of life has been curtailed …'((1961) 24 Mod LR at 25). Such, in effect, was the majority conclusion in the Court of Appeal, and I have respectfully to say that I find it the only acceptable conclusion.

There seems little room for doubt that inspiring and underlying the resistance to giving an affirmative answer to what I have labelled question (A) are considerations of policy. For example, it is claimed that, if compensation for the lost years are recovered by dependants in excess of their Fatal Accidents Acts claims, they will gain what Griffiths J somewhat derogatorily described in *Kandalla v British Airways Board* [1980] 1 All ER 341 at 349,[1980] 2 WLR 730 at 739 as a 'windfall', and added:

'The damages will, of course, almost always be paid by insurance companies, but the ability to pay such damages will have to be passed on to the general public through increased premiums; so it is the public who will be paying these extra ⊄ 586⁄ damages which appear to me to breach the underlying basis on which damages are assessed, namely that they should be fair compensation for the loss sustained.'

But, my Lords, such 'windfalls' have not appeared inadvertently on the legal landscape. On the contrary, the legislature had them clearly in contemplation when it provided by s 1(5) of the 1934 Act that—

'The rights conferred by this Act for the benefit of the estates of deceased persons shall be in addition to and not in derogation of any rights conferred on the dependants of deceased persons by the Fatal Accidents Acts, 1846 to 1908 …'

It has further been objected that the deceased may by his testamentary disposition have left his estate, wholly or in part, away from his dependants, with the result that, in the words of Griffiths J ([1980] 1 All ER 341 at 349,[1980] 2 WLR 730 at 738)—

'Not only will the estate be able to recover the full value of the sums he spent on his dependants, but the dependants will also be able to

ase 1:00-cv-03741-PCH Document 76 Entered on FLSD Docket 08/23/2001 Page 27 of 3
*All England Law Reports 1936*
All ER 1981 Volume 1 (08/17/2001 02:34pm)
books on screen™

*Gammell v Wilson and others   Furness and another v B & S Massey Ltd*

recover the like sum under the Fatal Accidents Acts.'

It is in the light of such criticisms as these that the attention of this House was drawn to the express provision in s 2(3) of the Damages (Scotland) Act 1976 that—

'There shall not be transmitted to the executor of a deceased person any right to damages ... (b) by way of compensation for patrimonial loss attributable to any period after the deceased's death ...'

But, despite the view expressed by Megaw LJ that in England and Wales such a provision had been effectively anticipated by s 1(2)(c) of the 1934 Act and that 'legislation on the point would not be necessary to achieve the desirable result that English and Scottish law should conform in this respect', I have already indicated my own respectful view that the law of this country remains different.

And, in relation to the complaint that the decisions of the Court of Appeal and Tudor Evans J impose additional and unfair liability on the wrongdoer, it is just as well to recall the anticipatory words of Lord Atkin many years ago in *Rose v Ford* [1937] 3 All ER 359 at 363, [1937] AC 826 at 835:

'I ... see no difficulty as to the alleged duplication of damages under the Act of 1934 and the Fatal Accidents Acts. If those who benefit under the last-mentioned Acts also benefit under the will or intestacy of the deceased personally, their damages under those Acts will be affected. If they do not, there seems no reason why an increase to the deceased's estate in which they take no share should affect the measure of damages to which they are entitled under the Act.'

My Lords, I would answer question (A) in the affirmative.

(B). *On what basis should damages for the 'lost years' be assessed?*

My Lords, the assessment of compensation for the 'lost years' rests on no special basis of its own and it proceeds on no peculiar principle. It may present unusual difficulties, but the task itself is the ordinary one of arriving at a fair figure to compensate the estate of the deceased for a loss of a particular kind sustained by him in his lifetime at the hands of the defendant. But the appellants in *Gammell* submit that there was *no* evidence from which Deputy Judge Hytner QC could have assessed and awarded any damages in respect of the 'lost years', and that, whereas he made an award of £6,656 under that head,'in the absence of any cogent evidence of substantial savings the court can and should award no more than a modest conventional sum'. Such material as was available to the learned judge was admittedly meagre, but it was there to be weighed up. The amount of the award consequently arrived at was unanimously upheld in the Court of Appeal, and in my judgment it should not be interfered with by this House.

In the *Furness* case, it is objected that any damages awarded to the estate of a deceased person for the lost years amount not to fair compensation but to a windfall, whether or ⌖ 587 not the deceased leaves dependants. But castigation of 1934 Act damages as a 'windfall' is no justification for denying them in toto. More cogent is the further criticism that 'any assessment is at best speculative, usually pure guesswork, and where there is any basis for making a calculation such a basis is frequently unreal'. It is true that the task confronting Tudor Evans J was difficult, but, even so, there was available to him the sort of exiguous material which frequently has to be dealt with in the courts. And, if I may say so, in doing his valiant best he had the inestimable advantage of vast experience in coping with difficulties of the very kind that arose in *Furness*. On general principles, this House will interfere only where an assessment of damages is perverse or it appears from the amount awarded that it was arrived at on an incorrect principle. I take leave to doubt that I should have awarded the plaintiffs in *Furness* as high a sum as £15,547 for the 'lost years'. But here again I see no error in principle, and, while counselling moderation in assessing such claims so as to reflect the high degree of speculation inevitably involved, I am not prepared to hold that the award calls for adjustment.

My Lords, in the result I would dismiss the appeal in each of the cases.

**LORD FRASER OF TULLYBELTON.** My Lords, I have had the advantage of reading in draft the speeches prepared by my noble and learned friends Lord Diplock and Lord Scarman, and I agree with them. Under the existing legislation, and following the decision of this House in *Pickett v British Rail Engineering Ltd* [1979] 1 All ER 774, [1980] AC 136, there is, in my opinion, no escape from dismissing both these appeals, but, like Lord Diplock, I regard the result as neither sensible nor just.

It is, no doubt, just and sensible that, where the death of the family breadwinner is caused by the negligence of some other person, that person should be liable to compensate the deceased's dependants for the injury which they have suffered from the death. The main element of injury will normally be loss of support. Such compensation is provided for by the Fatal Accidents Act 1976. But it seems to me difficult to justify a law whereby the deceased's estate, which may pass to persons or institutions in no way dependent on him for support, can recover damages for loss of earnings, or other income, which he would probably have received during the 'lost years'. It is particularly difficult to justify the law in cases such as the present, in each of which the deceased was a young man with no established earning capacity or settled pattern of life. In such cases it is hardly possible to make a reasonable estimate of his probable earnings during the 'lost years' and it is, I think, quite impossible to take the further step of making a reasonable estimate of the free balance that would have been available above the cost of maintaining himself throughout the 'lost years', and the amount of that free balance is the relevant figure for calculating damages. The process of assessing damages in such cases is so extremely uncertain that it can hardly be dignified with the name of calculation: it is little more than speculation. Yet that is the process which the courts are obliged to carry out at present.

In my opinion, the unhappy state into which this part of the law of England has fallen can now only be corrected by legislation on lines similar to that recently enacted for Scotland, for much the same reason, in the Damages (Scotland) Act 1976: see ss 2(3)(b) and 9.

The amount of damages awarded in both these cases seems to me high, but having regard to the uncertain basis of assessment which I have mentioned I do not feel able to say that they proceed on any error of principle. I would therefore not interfere with them.

I would dismiss both appeals.

**LORD RUSSELL OF KILLOWEN.** My Lords, these appeals involve the next step after *Pickett v British Rail Engineering Ltd* [1979] 1 All ER 774, [1980] AC 136 in this House. In that case it was decided that when, as a result of a personal injury to X due to the fault of another, the term of the life of X was shortened X was entitled to claim in his damages compensation for financial benefits (in that case earnings) which would have ⌖ 588 come to him during the 'lost years', less what he might have been expected to spend on himself. I ventured to dissent for reasons which I gave briefly, being of opinion that if such an advance were to be made it were better for it to be done by legislation rather than by a judicial decision, one which was perhaps induced by consideration of the fact that, otherwise, dependants of X, he having pursued his claim to judgment, would not have a Fatal Accidents Act claim, which claim would have brought such lost future earnings into calculation. *Pickett* was not a case of survival on death of a cause

All England Law Reports 1936-
All ER 1981 Volume 1 (08/17/2001 02:34pm)
Case 4:05-cv-03374-H Document 76   Entered on FLSD Docket 08/23/2001   Page 28 of 3
books on screen™

*Gammell v Wilson and others  Furness and another v B & S Massey Ltd*

of action, and the Law Reform (Miscellaneous Provisions) Act 1934 was not in point.

Misliking, as I did, the decision in *Pickett* and drawing as I did attention to possible repercussions beyond the question of earnings in the lost years, I did not then envisage the problems that would be raised by it under the 1934 Act.

In both these cases the death of X was caused by the wrongful act or omission of the defendant, substantially instantaneously. One was aged 15, the other 22. The personal representatives in each case sued, claiming damages on behalf of the estate for the wrong done to the deceased, and also under the Fatal Accidents Act on behalf of the dependants. In order to claim on behalf of the estate reliance had to be placed on the 1934 Act, which reversed the principle that a personal action did not survive the death of the injured person.

Section 1(1) of the 1934 Act provided that (subject to the provisions of s 1) on the death of X all causes of action vested in him shall survive for the benefit of his estate, but excluding causes of action for defamation or seduction etc, not now material. Subsection (2) deals with the damages recoverable for the benefit of the estate where a cause of action survives under sub-s (1) for the benefit of the estate. It is in the following terms:

'Where a cause of action survives as aforesaid for the benefit of the estate of a deceased person, the damages recoverable for the benefit of the estate of that person:—(a) shall not include any exemplary damages;(b) in the case of a breach of promise to marry shall be limited to such damages, if any, to the estate of that person as flows from the breach of promise to marry;(c) where the death of that person has been caused by the act or omission which gives rise to the cause of action, shall be calculated without reference to any loss or gain to his estate consequent on his death, except that a sum in respect of funeral expenses may be included.'

In each of these cases there was undoubtedly a cause of action against the wrongdoer vested in the deceased in his life, even though only momentarily prior to his death, and under sub-s (1) that cause of action survived for the benefit of his estate. His personal representatives could, prima facie, by standing in his shoes claim such damages as he, had he survived, could have claimed as flowing from the cause of action; and under the decision in *Pickett* part of those damages would fall to be assessed in respect of the financial disappointments involved in the 'lost years'. So the short point is whether sub-s (2)(c) excluded what might be labelled '*Pickett* damages' from a claim brought for the benefit of the deceased's estate.

The structure of sub-s (2) is to be noted. It deals with a case of a cause of action surviving for the benefit of a dead man's estate and affects in terms the damages recoverable for the benefit of that estate. The cause of action survives, but the quantum of damages is not under paras (a) and (b) to be the same as would have been recoverable by the deceased person pursuing to judgment on the cause of action in his lifetime. By para (a), if he would have been entitled to exemplary damages, such damages are not to be 'included' in the damages recoverable for the benefit of his estate. By para (b)(now repealed by the Law Reform (Miscellaneous Provisions) Act 1970, s 7 and Schedule) in a case of breach of promise to marry the damages recoverable for the benefit of the estate of the deceased person are limited to such damage (if any) to the estate of the deceased as flows from the breach of promise, and I would suppose this to be intended to limit the damages to net financial outlay by the plaintiff incurred on the faith of the promise but for which he (or her) estate would have been greater, and to exclude damages that might have been based on matters such as injured feelings.

🔎 **589**

Paragraph (c) is somewhat different in construction. It deals with a particular case when the death of X was caused by the wrong which constituted the relevant cause of action which under sub-s (1) survives for the benefit of the estate of X. In such case para (c) states how the damages recoverable for the benefit of the estate of X are to be calculated: they are to be 'calculated without reference to any loss or gain to his estate consequent on his death, except that a sum in respect of funeral expenses may be included'. What is involved in this phrase? What, so to speak, is it getting at? There is no indication to be got from paras (a) and (b); they have their own reasons, logical or not.

In para (c) we are dealing with a case in which a wrongdoing to X has not only harmed him but has even caused his death, in one sense the greatest harm that could be done to him. It is perhaps simple to say that two heads of damages normally involved (though I think regrettably) in death by a wrongdoing are excluded by para (c) from the calculation of damages, viz (i) damages for loss of expectation of life and (ii) damages in respect of financial benefits which would have accrued during the lost years leaving it for the estate to claim damages (in an appropriate case) for loss of earnings before death, expenses of treatment, pain and suffering, all of which would have, if recovered, swollen the estate, as would indeed damages under (i) and (ii) above if recovered in his life by X.

But the difficulty arises in two ways. (1) Why should the legislature have so tempered the wind to the wrongdoer albeit it has done so to some extent by paras (a) and (b); and (2) more importantly, it is not only loss but also gain to the estate consequent on the wrongfully induced death that is excluded from the calculation of damages. The impression is gained of balance sheet (perhaps rather a profit and loss account) being drawn up. What *gain* to the estate consequent on the death is in mind? The immediate example that springs to the mind is life insurance. There may be others which by the general law a wrongdoer cannot plead in reduction of the damages which he must pay. I find it impossible to think of any *gain* to the estate of X consequent on his death which could be set against the liability of the wrongdoer for his responsibility for the cause of action other than one under the general law.

This in my opinion throws a conclusive light on the reference, in the calculation, to loss consequent on the death. I accept the suggestion that it refers to liabilities of the estate which arise only because it is the estate of a deceased person under the general law.

Accordingly, I am of opinion that the damages recoverable for the benefit of the estates in both these cases include damages which he could have recovered if living in respect of the lost years. I would therefore dismiss these appeals.

My Lords, I regret these decisions. I think that the law has gone astray by excessive refinement of theory. I would welcome legislation which overruled in the future the results of the decision in *Pickett*, and its extension in cases such as the present, which since *Pickett* has led to almost grotesque embodiment of estimates, or rather guesses. That might be combined with legislation which in some way prevented respondents being barred from a Fatal Accidents Act claim by the fact that the deceased pursued his claim to judgment.

For good measure I may add that I do not favour a system which embodies a 'conventional'(or any) figure being awarded for loss of expectation of life.

So far as concerns quantum of damages in respect of the 'lost years' claims for the benefit of the estates, I am quite unable to assert that they were either right or wrong.

Accordingly I would dismiss both appeals.

**LORD SCARMAN.** My Lords, I also would dismiss these appeals.

In *Gammell v Wilson* [1980] 2 All ER 557,[1980] 3 WLR 591 the defendants appeal, with the leave of the Court of Appeal, from an order of the Court of Appeal dismissing their appeal from part of a judgment given by Mr B A Hytner QC sitting as a deputy judge of the High Court. In *Furness v Massey* the defendants appeal direct from part of a judgment given by Tudor Evans J. The judge granted his certificate under s 12(1) of the Administration of Justice Act 1969, and the House gave leave to appeal.

*Gammell v Wilson and others Furness and another v B & S Massey Ltd*

The two appeals were heard together, since they raise the same two questions of law. First, when the victim of an accident, for which the defendant is legally responsible, has ✎ 590i died before action brought or judgment recovered, does the cause of action, which he would have had, if he had lived, for damages for the loss of earnings during 'the lost years', survive for the benefit of his estate? It is a question of construction of s 1(2) of the Law Reform (Miscellaneous Provisions) Act 1934. Second, if it does, what is the correct approach in law to the assessment of such damages? The appellants in each appeal also contend that the assessment of the trial judge was in any event excessive. The third point will require separate consideration of the two cases.

The appeals are a natural, even an inevitable, consequence of the House's decision in *Pickett v British Rail Engineering Ltd* [1979] 1 All ER 774,[1980] AC 136. Ruling that a living plaintiff is entitled to such damages, the House was not called on in *Pickett's* case to construe s 1(2) of the Law Reform Act. Nor was the House faced with any very difficult problem in the assessment of damages, for Mr Pickett was 53 years of age at the time of trial, a family man whose expectations for the future, had not his injuries supervened, were reasonably clear. But in these two appeals the facts are very different. In the *Gammell* case a boy, aged 15, was killed in a road accident, suit being brought by his father under the Fatal Accidents Act 1976 for his and his mother's benefit as his dependants, and under the Law Reform (Miscellaneous Provisions) Act 1934 for the benefit of the boy's estate. In the *Furness* case a young man, aged 22, unmarried, was killed at work, suit being brought by his parents under the 1976 Act for their benefit as dependants and under the 1934 Act for his estate. In each case the deceased died intestate.

*Section 1(2)(c) of the 1934 Act*
The relevant provisions of s 1 of the 1934 Act are the following:

'(1) Subject to the provisions of this section, on the death of any person after the commencement of this Act all causes of action subsisting against or vested in him shall survive against, or, as the case may be, for the benefit of, his estate. Provided that this subsection shall not apply to causes of action for defamation or seduction or for inducing one spouse to leave or remain apart from the other or to claims under section one hundred and eighty-nine of the Supreme Court of Judicature (Consolidation) Act, 1925, for damages on the ground of adultery.
'(2) Where a cause of action survives as aforesaid for the benefit of the estate of a deceased person, the damages recoverable for the benefit of the estate of that person:—(a) shall not include any exemplary damages;(b) in the case of a breach of promise to marry shall be limited to such damage, if any, to the estate of that person as flows from the breach of promise to marry;(c) where the death of that person has been caused by the act or omission which gives rise to the cause of action, shall be calculated without reference to any loss or gain to his estate consequent on his death, except that a sum in respect of funeral expenses may be included ...
'(5) The rights conferred by this Act for the benefit of the estates of deceased persons shall be in addition to and not in derogation of any rights conferred on the dependants of deceased persons by the Fatal Accidents Acts, 1846 to 1908 ...'

(Section 1 has since been amended by the Law Reform (Miscellaneous Provisions) Act 1970, s 7 and Schedule).

Subsection (5) has some general significance. It makes clear that the rights which under the Act survive for the benefit of the estate are additional to, not a substitution for, the rights conferred on dependants by the fatal accidents legislation. In dealing, therefore, with a 'law reform' claim, the court has no regard to what dependants can claim under the Fatal Accidents Act. The converse is, however, not true. In assessing the loss of a dependency under the fatal accidents legislation the courts have always had regard to the benefits accruing to the dependants from the estate of the deceased. In most fatal accident cases, the dependants will, of course, be the beneficiaries of the estate. In such cases there will be no 'double recovery', by which is meant no recovery both by the estate and the dependants of damages calculated by reference to the lost earnings of the lost years; for the dependants' claim will be reduced or extinguished ✎ 591i(subject to certain exceptions) by the benefits they receive from the estate. But, if the deceased has made a will leaving his estate, or a substantial part of it, to other than his dependants, both the estate and the dependants will have a claim.

This element of advantage gained by beneficiaries of the estate who are not dependants of the deceased has been described by judges, and others, as a 'windfall'. It arises because the estate's claim is additional to, and not in derogation of, the rights of the dependants. If, which many believe, it is a mischief which should be removed from our law, legislation would be needed. A model is to hand in the Damages (Scotland) Act 1976, which recognises the right of a living pursuer to damages for the lost years but refuses to the estate of one who has died before suing his claim to judgment: see ss 2(3) and 9.

Section 1(1) of the 1934 Act creates no cause of action, but provides only for the survival of an existing cause of action. I agree with your Lordships in thinking that in the light of *Pickett's* case it is not possible to sustain any view of the law other than that the cause of action for damages for the lost years vests in the deceased when he is injured, and, if he be killed instantaneously, immediately before his death. The reasoning of *Rose v Ford* [1937] 3 All ER 359,[1937] AC 826 is as applicable to a 'lost years' case as to the case of general damages for shortened expectation of life; and I respectfully adopt what my noble and learned friend Lord Edmund-Davies has said on the point.

Under s 1(1), therefore, the cause of action survives for the benefit of the estate unless sub-s (2) provides otherwise. Paragraphs (a) and (b) of the subsection do make irrecoverable by the estate certain categories of damages which a living plaintiff could recover. Paragraph (c) has a different purpose: it provides a method of calculating damages where the victim's death was itself caused by the act or omission which gave rise to the cause of action. No account is to be taken of 'any loss or gain to his estate' except for funeral expenses met out of the estate.

In the course of his closely argued dissenting judgment in *Gammell's* case Megaw LJ concluded that, as damages for the lost earnings of the lost years are in respect of a loss 'consequent on' the death, they are irrecoverable by the estate. His approach to s 1(2)(c) was that it must be interpreted as excluding from recovery by the estate damages which would have been recoverable by the deceased if he had not died. He interpreted para (c) as being comparable with paras (a) and (b).

The majority, Brandon LJ and Sir David Cairns, interpreted s 1(2)(c) in the opposite sense. 'Loss to his estate consequent on his death' was not, in their view, to be construed as including any loss in respect of which a right to recover damages was already vested in the deceased immediately before his death.

Such authority as there is supports the majority view. *Some members of this House*, albeit obiter, did consider the problem of s 1(2)(c) in *Rose v Ford*. Lord Atkin said of the subsection: 'Plainly this does not mean that his estate is not to gain by the award of any damages at all, for this would be absurd'(see [1937] 3 All ER 359 at 363,[1937] AC 826 at 835). Lord Wright, in the passage quoted by my noble and learned friend Lord Edmund-Davies, read the subsection as requiring to be excluded from the calculation only those items of loss or gain to the estate which the dead man, had he lived, could neither have experienced nor collected ([1937] 3 All ER 359 at 368,[1937] AC 826 at 842). His instance of a gain ('insurance moneys falling due on death') is a good illustration, even though his instance of a loss ('annuities ceasing on death') is not; for that loss, like the loss of the earnings of the lost years, is to be attributed to the years lost by reason of the injury sustained and is, therefore, part of the cause of action which vested in the deceased before his death. Nevertheless, there are losses to an estate consequent on death which could never arise as losses to the deceased

All England Law Reports 1936
All ER 1981 Volume 1 (08/17/2001 02:35pm)
ase 1:00-cv-03741-PCH Document 76   Entered on FLSD Docket 08/23/2001   Page 30 of 3
books on screen™

*Gammell v Wilson and others Furness and another v B & S Massey Ltd*

during his lifetime. Brandon LJ, who listed some of them, also made the telling point that, were it not for the express exception in s 1(2)(c) itself, funeral expenses would be such a loss.

It may be, as Brandon LJ and Sir David Cairns suggested, that sub-s (2)(c) was introduced into s 1 ex abundanti cautela. Certainly, if construed as limited to gains or losses *to the estate* as distinct from gains or losses to the deceased which survive for the benefit of the estate, it is consistent with the principle declared in sub-s (1), viz that, ⬧ 592⬧ subject to the section, 'all causes of action' shall survive. If Megaw LJ be correct in construing it as excluding losses suffered by the deceased when injured but arising after death, it would constitute a substantial erosion of the rights surviving for the benefit of his estate after his death. If there be two possible interpretations of sub-s (2)(c), I have no doubt that, the purpose of the section being to eliminate almost totally from the law the effect of the ancient rule actio personalis moritur cum persona, the correct interpretation is that which would tend to further, rather than to limit, that purpose. I would expect to find, as in paras (a) and (b), express limitations clearly formulated. But I do not think that, on a proper consideration of the language of s 1(2)(c), the choice arises. Its careful drafting so as to distinguish its effect from the purely exclusionary paras (a) and (b) of the subsection leaves no room for doubt. In my view, therefore, the words 'loss or gain to his estate consequent on his death' mean in the context of the section a loss or gain *to the estate* consequent on death and do not cover a loss or gain capable of being suffered or collected by the deceased before his death.

*Assessment of the damages*

The correct approach in law to the assessment of damages in these cases presents, my Lords, no difficulty, though the assessment itself often will. The principle must be that the damages should be fair compensation for the loss suffered by the deceased in his lifetime. The appellants in *Gammell's* case were disposed to argue, by analogy with damages for loss of expectation of life, that, in the absence of cogent evidence of loss, the award should be a modest conventional sum. There is no room for a 'conventional' award in a case of alleged loss of earnings of the lost years. The loss is pecuniary. As such, it must be shown, on the facts found, to be at least capable of being estimated. If sufficient facts are established to enable the court to avoid the fancies of speculation, even though not enabling it to reach mathematical certainty, the court must make the best estimate it can. In civil litigation it is the balance of probabilities which matters. In the case of a young child, the lost years of earning capacity will ordinarily be so distant that assessment is mere speculation. No estimate being possible, no award, not even a 'conventional' award, should ordinarily be made. Even so, there will be exceptions: a child television star, cut short in her prime at the age of five, might have a claim; it would depend on the evidence. A teenage boy or girl, however, as in *Gammell's* case may well be able to show either actual employment or real prospects, in either of which situation there will be an assessable claim. In the case of a young man, already in employment (as was young Mr Furness), one would expect to find evidence on which a fair estimate of loss can be made. A man, well-established in life, like Mr Pickett, will have no difficulty. But in all cases it is a matter of evidence and a reasonable estimate based on it.

The problem in these cases, which has troubled the judges since the decision in *Pickett's* case, has been the calculation of the annual loss before applying the mutiplier (ie the estimated number of lostworking years accepted as reasonable in the case). My Lords, the principle has been settled by the speeches in this House in *Pickett's* case. The loss to the estate is what the deceased would have been likely to have available to save, spend or distribute after meeting the cost of his living at a standard which his job and career prospects at time of death would suggest he was reasonably likely to achieve. Subtle mathematical calculations, based as they must be on events or contingencies of a life which he will not live, are out of place; the judge must make the best estimate based on the known facts and his prospects at time of death. The principle was stated by Lord Wilberforce in *Pickett's* case [1979] 1 All ER 774 at 781–782,[1980] AC 136 at 150–151:

'The judgments, further, bring out an important ingredient, which I would accept, namely that the amount to be recovered in respect of earnings in the "lost" years should be after deduction of an estimated sum to represent the victim's probable living expenses during those years. I think that this is right because the basis, in principle, for recovery lies in the interest which he has in making provision ⬧ 593⬧ for dependants and others, and this he would do out of his surplus. There is the additional merit of bringing awards under this head into line with what could be recovered under the Fatal Accidents Acts.'

I turn now to consider whether there was error by the judge in the assessment of damages in either case. First, *Gammell's* case. The learned deputy judge directed himself correctly in law, quoting the relevant passages from the speeches in *Pickett's* case. It was urged that the factual basis, on which he proceeded, was too exiguous to enable a reasonable assessment to be made. I do not agree. The boy was 15. His father is of the Romany blood, uneducated and illiterate. His mother is a well-educated woman who, as a witness, impressed the judge. She knew her boy and was confident he would make his way in the world. He never went to school, but his mother taught him his three Rs. At 14 (the year before he died) he began work. When he died, he was earning £20 a week from the sort of work he, with his Romany background, was well placed to find (fruit picking, scrap dealing and road surfacing). He was saving up for a van in order to follow the career of an antique dealer (in the footsteps of an uncle). When he died, his future was not merely matter for speculation: he had made a start, was in work and had won the confidence of his sensible mother, who had herself educated him.

The judge took a multiplier of 16 for the lost years, a 'surplus'(on Lord Wilberforce's formula) of £8 per week, and assessed the value of the claim for lost earnings of the lost years at £6,656. No exception can be taken to the multiplier. The £8 per week, however, was said to be a figure picked out of the sky. It was not. It was based on the circumstances known to the judge. I do not believe that a sensible parent (like his mother) would have rated his prospects as nil or as substantially lower than the judge did. The only question which the House has to consider is whether, on the facts found, it was an unreasonable estimate, ie so excessive as to justify its reduction by an appellate court. For myself, I think it was a moderate and reasonable estimate; but, even if I considered it high, it is not so high as to justify the House's intervention.

The award of £6,656 is to be compared with the damages of £3,184 which the judge assessed as the value of his parents' dependency claim under the Fatal Accidents Acts. Since he died intestate, they will receive the total damages of £9,090 (less expenses) awarded the estate, which will be more than sufficient to extinguish their Fatal Accidents claim.

In *Furness's* case the learned judge assessed the total damages under the 1934 Act at £19,106 and awarded the estate 90% of the total (having found a degree of contributory negligence). He assessed the damages under the Fatal Accidents Acts at £2,028, to 90% of which the parents would have been entitled had not their claim been extinguished by the benefits they will get from the damages awarded to their son's estate.

He assessed damages for the lost years at £17,275. This is a high figure but it cannot be said either that the judge erred in principle in reaching it or that it is so high that it must be wrong. In the course of a careful and diligent judgment the judge directed himself in law in accordance with the speeches in *Pickett's* case. He had a more extended factual basis for his assessment than had the judge in *Gammell's* case. At the time of his death young Mr Furness was in steady employment. He was active and healthy. He was living at home, enjoying the full life of a young man with plenty of pleasant things to do and no commitments. The judge estimated, on the basis of his earnings up to his death, that for the future he would have earned £4,063 a year net. He had a substantial body of evidence relating to his way of life on which he could assess his probable living expenses both for the immediate future and in the longer term. He put it thus: 'I think he would have spent two-thirds of his income when at home and three-quarters after he

and left home. Finally, on the basis of a normal life expectancy, he applied a multiplier of 16.

It was not suggested that this very experienced judge had departed from the principle and practice of the courts. The true case for the appellants was that the resultant figure of £17,275 was excessive; and the contrast with the value of the parents' dependency (£594) (assessed at £2,028) was emphasised. If the law allows damages for the lost years, as since *Pickett*'s case it certainly does, there is nothing excessive in a figure of £17,000 for an active and healthy young man in steady employment struck down in the early days of his working life.

My Lords, there is some disquiet expressed by judges, and understandably felt by insurers, about two aspects of the law: the 'double recovery' now possible in some cases, and the very great discrepancy which can arise, as happened in the *Furness* case, between the damages recoverable by the estate for the lost years and the damages recoverable by the dependants under the Fatal Accidents Act. Each of these possibilities may well be a mischief; certainly, a law which allows the discrepancy to arise wears the appearance of anomaly, and is unlikely to be understood or acceptable.

The logical, but socially unattractive, way of reforming the law would be to repeal the Fatal Accidents Act, now that the rule actio personalis moritur cum persona has itself belatedly perished. This would leave recovery to the estate; and the dependants would look, as in a family where the breadwinner is not tortiously killed, to him (or her) for their support during life and on death. They would have the final safeguard of the Inheritance (Provision for Family and Dependants) Act 1975. But the protection of the fatal accidents legislation has been with us for so long that I doubt whether its repeal would be welcomed. If, therefore, the law is anomalous (and it certainly bears hardly on insurers and ultimately the premium-paying public), the way forward would appear to be that adopted by Parliament for Scotland. The Damages (Scotland) Act 1976 appears to work well; and the Royal Commission on Civil Liability and Compensation for Personal Injury (Cmnd 7054–I, ch 12, para 437) recommends its adoption in English law. The denial of damages to the estate, but not to a living plaintiff, is the denial of a right vested in the estate; but social and financial circumstances, as well as the legal situation, of which the Fatal Accidents Act is now an integral part, suggest that, though illogical, this is the reform which is needed.

*Appeals dismissed.*

Solicitors: *Mawby Barrie & Scott* agents for *Gardner & Croft*, Canterbury (for Mr Gammell); *Hextall, Erskine & Co* agents for *Stanley Evans, Oates & Co*, Manchester (for Mr Wilson and Swift & Co Ltd); *Furley, Page, Fielding & Pembrook*, Canterbury (for B & S Massey Ltd); *Brian Thompson*, Manchester (for Mr and Mrs Furness).

595

Mary Rose Plummer  Barrister.